## 26647. TRI-COUNTY LIVESTOCK AUCTION COMPANY v. BANK OF MADISON.

ARGUED SEPTEMBER 13, 1971—DECIDED NOVEMBER 8, 1971.

*Harrison & Garner, G. Hughel Harrison,* for appellant.

*Lambert & Carter, E. R. Lambert, Preston & Benton, William L. Preston,* for appellee.

GRICE, Justice. This litigation is between a bank and a livestock commission merchant over which is entitled to the proceeds of the sale of certain cattle.

It began when the Bank of Madison, hereinafter referred to as the Bank, filed suit in the Superior Court of Walton County against Tri-County Livestock Auction Company, hereinafter referred to as the Stockyard.

The complaint, insofar as necessary to recite here, made the allegations which follow. On November 9, 1958, the Bank perfected a security interest in 800 head of cattle owned by W. E. Giddens, together with the increase and proceeds thereof by filing a financing statement, a copy of which was attached to the complaint, and also by a security agreement between the parties, copy also attached. The debtor under the security agreement, Giddens, has defaulted under its terms. The Stockyard is in possession of part of the collateral described in the financing statement, "to-wit, the proceeds from the sale of said cattle or their increase, and more particularly the sum of $4,647." It prayed for judgment for that amount against the Stockyard.

To this complaint the Stockyard filed an answer which made the following essential allegations.

The Stockyard denies any indebtedness to the Bank since Giddens did not acquire any title or interest in the cattle allegedly purchased from it, and later returned to it for sale, in that Giddens did not make payment for the cattle.

It is not liable to the Bank because it is a livestock commission merchant and the sale to Giddens was made in the ordinary course of business and under *Code Ann.* § 109A-9—307 (3) (Ga. L. 1969, p. 149) it is not liable to the Bank notwithstanding the perfection of the security interest.

Furthermore, it is not liable to the Bank because within the time provided by law it notified Giddens that the check he issued to it in payment of the cattle was dishonored and upon such notice the cattle were returned to it without ever having been paid therefor. Giddens never had title to the cattle in question because the title was reserved and did not pass until the check was paid and it was not paid; the sales invoices issued by the Stockyard to Giddens show on their face the words "customers paying for livestock by check or draft agree that title does not pass until funds have actually been received."

The Stockyard is licensed by the State of Georgia and registered under the Federal Packers and Stockyard Act and at all times acted only in the capacity as agent and provided services and accounted to shippers in accordance with the law and rules and regulations applicable to livestock auction markets.

It denied that it was in possession of proceeds of the sale of such cattle; that Giddens never had any interest in the livestock sufficient to bring the livestock in question within the security instrument or that such cattle were ever a part of the collateral described in the financing statement or security agreement attached to the Bank's complaint.

The Stockyard's answer prayed that the Bank's prayers be denied and that it be discharged.

Upon the trial the court denied the Bank's motion for directed verdict and the jury found in favor of the Stockyard. Judgment was entered accordingly.

The Court of Appeals reversed with direction, holding in substance as follows:

(1) That this was a "cash sale" under *Code Ann.* §§ 109A-2—403 and 109A-9—113, and therefore any reservation by the seller of the title is limited in effect to a reservation of

a security interest under *Code Ann.* § 109A-2—401;

(2) That the Bank's security interest covering after acquired cattle attached to the cattle sold when they were placed upon Giddens' farm with other cattle and became perfected by filing and took priority over the unperfected purchase money security interest of the Stockyard. *Code Ann.* §§ 109A-9—312 (2), 109A-9—302. Therefore when Giddens subsequently sent the Stockyard cattle in excess of the number purchased and informed the Stockyard he was returning the cattle because he was unable to pay the check, and the Stockyard after actual notice of the Bank's lien sold the cattle to a third party, the Bank is entitled to the proceeds of such sale. *Code Ann.* § 109A-9—306.

(3) The return of the cattle by Giddens to the Stockyard was not a sale in due course of business under *Code Ann.* § 109A-2—401 (4), and even so was a sale of farm products excluded from *Code Ann.* § 109A-9—307 (1); nor did such repossession, if a perfection of a security interest of the Stockyard, relate back to the time of the original sale. *Code Ann.* § 109A-9—305.

(4) Accordingly it held that the evidence did not authorize the verdict and judgment and that the trial judge erred in not directing a verdict in the Bank's favor.

We granted the application for certiorari.

Our conclusion is that the judgment of the Court of Appeals must be reversed.

We find it unnecessary to discuss and evaluate each of the holdings of the Court of Appeals set forth above.

Suffice it to say that the Court of Appeals judgment is based upon the erroneous assumption that there was a security agreement in force between the Bank and Giddens which covered the after acquired cattle in question here.

From our study of the record we find that no such agreement was entered into. This fact alone is dispositive of this review.

In this connection there is a fatal discrepancy between the description of the collateral in the security agreements between the Bank and Giddens, and that described in the

financing statement filed by the Bank by which its security interest was perfected. This is apparent from the following references to the salient documents.

On November 7, 1968, Giddens executed to the Bank a promissory note in the amount of $50,879.48, maturing on February 7, 1969, listing as collateral along with certain described real estate, "first claim to 800 head all grades and breed beef cattle located on above described real estate."

On November 9, 1968, the Bank filed a financing statement as to this note pursuant to the Uniform Commercial Code (*Code Ann.* § 109A-9—401 et seq.) which covered the following described property: "800 Head all grades and breed beef cattle located on farm of W. E. Giddens in Seats District of Morgan County, Georgia. Also all cattle on lands of W. E. Giddens located in Seats District of Morgan County, Georgia, and any increase thereof by birth or purchase." This statement was signed by the Bank and Giddens.

On July 7, 1969, Giddens executed to the Bank a renewal note of the foregoing one, for $32,069.08, maturing on October 15, 1969, listing as part of the collateral "800 Head cattle located on my farm in Morgan County, Georgia, being the same as held in Note B271 . . ." No financing statement was filed as to this second note.

On August 23, 1969, Giddens executed a demand note to the Bank for $18,000, listing as collateral "800 head cattle and a second claim on 10 acres and a third claim on 488 acres of land all in Mo. Co., Georgia. Also one Cert. of Dept. of the Bank of Madison for $10,000." Neither was any financing statement filed in connection with this third note.

On October 14, 1969, Giddens acquired from the Stockyard 40 head of cattle for the purchase price of $5,587.99. Giddens' check to the Stockyard in payment therefor was dishonored by the Bank on October 16, 1969, and 48 cattle were subsequently returned by him to the Stockyard on November 3, 1969. The next day these cattle were sold by agreement of the Bank and Stockyard because of their sickly condition and the proceeds were retained pending a

decision as to the prospective rights of the parties in them.

Therefore, it is quite pertinent whether there was an agreement between the Bank and Giddens that the collateral given as security for the loans was to include after acquired cattle.

If there was no such agreement, then under the Uniform Commercial Code (Title 109A of the Georgia Code), the Bank had no security interest in the 40 cattle in question here which could have been perfected by filing a financing statement.

Let us then consider how a security interest arises.

The procedures by which a security interest attaches are set forth in *Code Ann.* § 109A-9—204 (1), the first being that there must be an *agreement* that it attach.

Subsection (3) of that section states in material part that such agreement ". . . may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement."

*Agreement* is defined in *Code Ann.* § 109A-1—201 (3) as "the *bargain of the parties* in facts as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (109A-1—205 and 109A-2—208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts. (109A-1—103)." (Emphasis supplied).

Here the three notes signed by Giddens represent the security agreement or contract between the parties and the collateral agreed upon by them does *not* include any *after acquired cattle.* The financing statement filed by the Bank serves to perfect whatever interest it may have under the terms of the security agreement itself so as to give it priority over any unperfected security interest. *Code Ann.* §§ 109A-9—301, 109A-9—302.

But it can perfect only those interests which it acquired through the security agreements.

Therefore, the proceeds of the sale of the 40 head of cat-

330

tle involved in the transaction between Giddens and the Stockyard clearly were not a part of the Bank's security interest under the agreements made by it with Giddens.

Let us now consider the essentials of a financing statement.

*Code Ann.* § 109A-9—402 sets forth its formal requisites. In subsection (1) it declares that it is sufficient if it contains "a statement indicating the types, or describing the items, of collateral."

Subsection (5) provides that "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

In the instant case, however, it cannot be said that the discrepancy between the financing statement and the security agreements was either "minor" or "not seriously misleading." Indeed, it served to change the very basis of the contract between the parties as to the collateral pledged.

It is elementary that under the law of contracts the agreement itself governs the rights and liabilities of the parties. In our view nothing in the Uniform Commercial Code as adopted in this State requires a different result.

For the above reasons we hold that the Court of Appeals erred in reversing the judgment of the trial court.

It follows that it is not necessary to consider the questions dealt with in the opinion of the Court of Appeals.

For the foregoing reasons its judgment is

*Reversed. All the Justices concur.*