**FARMERS & MERCHANTS BANK OF EATONTON, Plaintiff,**

v.

**Clyde F. ALEXANDER, Defendant.**

**Civ. A. No. 84–478–1–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 20, 1987.

6. Alternatively, the debtor may wish to obtain a different expert witness.

**420**

Jack T. Camp, Newnan, Ga., for plaintiff.

William M. Flatau, Macon, Ga., for defendant.

OWENS, Chief Judge:

This case comes to the court on appeal from the order of the United States Bankruptcy Court for the Middle District of Georgia entered on November 6, 1984, which declared the debt owed by the debtor, Clyde F. Alexander, to the creditor, Farmers & Merchants Bank of Eatonton, to be dischargeable in bankruptcy. In passing on an appeal from the bankruptcy court, the district court must make an independent determination on the legal issues, but must accept the bankruptcy judge's findings of fact unless those findings are clearly erroneous. *See* Bankr.R. 8013 (West 1984); and *State Farm Mutual Automobile Ins. Co. v. Fielder*, 799 F.2d 656, 657 (11th Cir.1986). With this standard in mind, the court will review the bankruptcy court's finding of fact and will apply the relevant law to these facts.

### Procedural Background

On November 3, 1983, Mr. Alexander filed a petition under Chapter 7 of the United States Bankruptcy Code. In response to this filing, The Farmers & Merchants Bank of Eatonton filed a "Complaint Objecting to Discharge." In this complaint the creditor bank asserted that Mr. Alexander was not entitled to a discharge on a certain debt owed to the bank because of 11 U.S.C. § 727(a)(2), or alternatively, because of 11 U.S.C. § 523(a)(6). Mr. Alexander answered this complaint, and, further, asserted by way of counterclaim his contention that the assets in dispute were exempt property, and that the creditor bank's security was limited to a nonpossessory, nonpurchase-money security interest in those assets. Mr. Alexander, therefore, requested that the bankruptcy court invalidate creditor bank's security interest in these assets pursuant to 11 U.S.C. § 522(f).

The bankruptcy court tried this matter on April 23, 1984, and issued its findings of fact and conclusions of law. The bankruptcy court held that the debt owed by Mr. Alexander to The Farmers & Merchants Bank of Eatonton fully dischargeable in bankruptcy, and, accordingly, dismissed creditor banks complaint objecting to discharge.

### Factual Background

Mr. Alexander resides in Jasper County, Georgia, and is employed by the Georgia Kraft Company. Mr. Alexander also supplements his income by engaging in various farming endeavors. In the past, he had raised soybeans, wheat, and cotton, and had financed these crops by obtaining financing from creditor bank. These various loans had been secured by giving the bank a security interest in his crops and certain of his farm equipment.

In June of 1981, Mr. Alexander approached L.O. Benton, III, the president of creditor bank, and told him that the pro-

ceeds from the sale of his wheat crop, which was encumbered by a lien in creditor bank's favor, was not going to cover the amount of indebtedness outstanding with the bank. Mr. Alexander then suggested to Mr. Benton that he wanted to purchase eight-week-old feeder pigs, feed the pigs the wheat crop, sell the pigs for profit, and repay creditor bank from the proceeds. Mr. Alexander testified that he expected to sell the pigs in six or seven months, at which time the pigs would weigh approximately 200 pounds.

On July 13, 1981, creditor bank extended Mr. Alexander a $16,000 loan in order to carry out the pig purchasing scheme. Creditor bank and Mr. Alexander executed a consumer collateral note to evidence this indebtedness. The note was payable in full on January 8, 1982, and stated that it was secured by a lien on 13,000 bushels of Mr. Alexander's 1980–81 wheat crop and 400 feeder pigs. The note did not state that after-acquired pigs or offspring of the 400 feeder pigs were security under the note. Creditor bank filed a financing statement on July 13, 1981, which covered the wheat crop and the 400 feeder pigs.

The security agreement signed by Mr. Alexander did not require that the bank give their consent prior to any sale of the collateral. Mr. Lane, a bank officer, did testify, however, that he told Mr. Alexander not to sell any of the pigs without first notifying the bank or bringing the proceeds to the bank. In addition, the bank understood that Mr. Alexander intended to sell the pigs within one year of the July 13, 1981, loan.

Approximately three to four months after the July 13, 1981, loan, Mr. Alexander purchased between 375 and 425 feeder pigs. After he purchased them, the pigs contracted a contagious type of pneumonia, and Mr. Alexander testified that about 100 of the feeder pigs died. Mr. Alexander also incurred veterinary bills in the amount of $8,884.16 because of the onset of this pneumonia. In addition, the pigs now had to be fed a special protein-supplemented food. Because of these problems, Mr. Alexander's veterinarian advised him to sell the pigs and buy new pigs. Beginning on September 23, 1981, without the bank's consent and without remitting any of the sales proceeds to the bank, Mr. Alexander began selling the pigs.[1] Not all the pigs were sold at this time, and the remaining pigs bore offspring.

The proceeds from the sales of the pigs were used in part to feed and care for the remaining pigs, and some was used in the cotton farming operation. Mr. Alexander testified that he believed that the sale of the pigs was permissible since the proceeds were being used in the farming operation.

In May or June of 1983, which was nearly one and one-half years after the due date of the loan, creditor bank first demonstrated concern about Mr. Alexander's sale of the secured pigs without remittance of the sales proceeds to the bank. In a meeting with Mr. Benton, Mr. Alexander was told that the bank knew of the sales, and that he would have to make some arrangement to pay off the loan. Mr. Alexander admitted to Mr. Benton that he had sold pigs without paying the bank, and that he knew the sales were wrong. Mr. Alexander explained this statement, however, by stating that he only learned that the sales were wrong after he learned that a local farmer had been jailed for selling chickens without a lienholder's consent.

After this conversation with Mr. Benton, Mr. Alexander sold $1,920.72 worth of pigs, and a further $383.47 worth of pigs after he filed for bankruptcy. In total, Mr. Alexander received approximately $20,000.00 from the sale of pigs. Mr. Alexander testified that his expenses from raising the pigs more than exceeded this sum. An agent for the bank contradicted this testimony by stating that Mr. Alexander's pig raising expenses were substantially lower than the proceeds received from these sales.

1. Mr. Alexander did pay the bank $7,500.00 in September of 1981 from the sale of wheat and $65.80 at an undisclosed time from the sale of cotton. These payments were applied to obligations other than the July 13, 1981, loan.

### 11 U.S.C. § 523(a)(6) Relief

■ Creditor bank asserted in the proceedings below that Mr. Alexander was not entitled to a discharge on the $16,000 note since he allegedly disposed of collateral upon which the creditor bank held a valid lien, without first notifying the bank of the sale, and without remitting any of the proceeds of the sale to the bank. The bank, therefore, asserted that under these facts, 11 U.S.C. § 523(a)(6) prevented discharge of this debt. Section 523(a)(6) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

It is clear that in order to prevail under this section, the bank was required to demonstrate that Mr. Alexander had a subjective conscious intent to injury another entity or to injury the property of another entity when he sold the collateral in question. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 365, *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 5787, 5865. *See also* 3 Collier on Bankruptcy ¶ 523.16 (15th ed. 1984). Absent a finding of *willful intent* to harm the lienholder, the debt is dischargeable in bankruptcy. In other words, a showing of a mere "technical conversion" of the bank's property rights is insufficient to prevent a discharge of the debt. This is true even if the debtor sold the collateral in reckless disregard of the secured parties rights. *Id.*

The bankruptcy court found that prior to the meeting with Mr. Benton in the summer of 1983, the sales of pigs which Mr. Alexander made were not done with an intent to harm the bank. This finding of lack of intent is a factual finding and is, thus, subject to a clearly erroneous standard of review.[2] This standard of review is an insurmountable barrier to creditor bank's assertion that the amount of debt made unsecure by Mr. Alexander's sale of the collateral prior to this meeting is properly nondischargeable. Creditor bank's re-

liance upon the case of *Trust Company Bank v. Ricketts,* 16 B.R. 833 (Bankr.N.D. Ga.1982), is misguided. While the court in that case found certain facts sufficient to find intent to harm a lienholder, such facts only raise certain presumptions that can be rebutted by the debtor's own testimony that he did not have the subjective intent to harm the lienholder. In this case the bankruptcy court found Mr. Alexander's own statement that he did not sell the pigs to harm the bank credible, and, therefore, held the sales of pigs prior to the meeting in the summer of 1983 not to affect the dischargeability of the loan in question. The court has reviewed the evidence presented in this case and finds that finding of fact not to be clearly erroneous.

■ The bankruptcy court also found that the sales of pigs occurring after the meeting with Mr. Benton in the summer of 1983 were done with an intent to harm the lienholder. Based upon the evidence presented in the case, this court finds that such a finding of fact is also not clearly erroneous, and, is accordingly accepted by this court. After reaching this decision, however, the bankruptcy court further found that the creditor bank was unable to meet its burden of demonstrating that the pigs sold by Mr. Alexander after this meeting were pigs that the bank maintained a valid security interest in. Without this proof, the bankruptcy court found that 523(a)(6) was inapplicable because the bank was unable to prove that it maintained a valid lien on the pigs sold.

Under Georgia law, in order to maintain a security interest in after-acquired collateral, the security agreement must provide that such after-acquired collateral is covered under the security agreement. *See* O.C. G.A. § 11–19–203, –204(1)(Michie 1982); and *Tri-County Livestock Auction Co. v. Bank of Madison,* 228 Ga. 325, 185 S.E.2d 393 (1971). It is uncontroverted in this case that the security agreement signed by Mr. Alexander for the $16,000 loan did not cover after-acquired collateral, nor did it

---

**2.** *See Webster City Production Credit Association v. Simpson,* 29 B.R. 202, 212 (Bankr. N.D.Iowa

1983) (Whether intent to deceive was present is mostly a factual issue).

cover the offspring of the pigs purchased with these funds. The bank, therefore, did not have a valid security interest in the offspring of the pigs.

In order to prevail, creditor bank was required to demonstrate that the pigs sold after the 1983 meeting with Mr. Benton were actually from the original 400 pigs purchased. There is evidence that many of the pigs sold, due to their weights when sold, were not part of the original 400 pigs. While some may have been from the original purchase, the bankruptcy court refused to speculate on how many pigs were off-springs of the original 400 pigs and how many were actually pigs from the original purchase. Since the burden of proving a valid security interest lay with the creditor bank, the bankruptcy court correctly held that the sales of these pigs, even though done with an intent to harm the bank, did not prevent the discharge of the debt. *See Murphy & Robinson Investment Co. v. Cross*, 666 F.2d 873, 879–80 (5th Cir.1982) (Unit B) (Burden of proving elements of nondischargeability on debtor). The creditor bank must be able to demonstrate with some specificity the amount of collateral sold that was subject to a valid lien before it can take advantage of section 523(a)(6). Since the bankruptcy court's finding of fact that creditor bank had not demonstrated how many pigs sold after the meeting with Mr. Benton in the summer of 1983 is not clearly erroneous, this court is bound by that determination.

▪ With respect to the security interest in the wheat crop of Mr. Alexander, the evidence is clear that creditor bank had authorized Mr. Alexander to use the wheat in the pig raising operation. Mr. Alexander, therefore, did not dispose of this collateral in contravention to the bank's security agreement. The bankruptcy court, thus, correctly held that the use of the wheat was insufficient grounds for declaring Mr. Alexander's debt with the bank nondischargeable.

### 11 U.S.C. § 523(a)(4) Relief

▪ The creditor bank also asserted that under the facts of this case Mr. Alexander should be denied a discharge under 11 U.S.C. § 523(a)(4). This section provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

In deciding this issue, the bankruptcy court dismissed the possible argument that Mr. Alexander was acting in a fiduciary capacity with the bank. Rather, the bankruptcy court characterized their relationship as being merely one of debtor-creditor. The bankruptcy court, therefore, found the fiduciary exception to discharge inappropriate. The parties do not dispute that finding, and this court agrees with the bankruptcy court's authority for this conclusion.

With respect to the embezzlement and larceny theories asserted by creditor bank, the factual findings of the bankruptcy court, as already discussed, prevent this court from reversing the holdings of that court on these issues. An essential element of both larceny and embezzlement is a showing of an intent to harm the true owner of the property. The bankruptcy court found that Mr. Alexander did not have this conscious intent to harm the property of the bank prior to the meeting in the summer of 1983 with Mr. Benton. This court further found, *supra*, that such a finding was not clearly erroneous. In addition, while the bankruptcy court found that the sales made by Mr. Alexander after this meeting were done with an intent to harm creditor bank, it also found that creditor bank could not prove that it had a valid security interest in the property sold. Again, this court has found, *supra*, that this finding was also not clearly erroneous. Because the creditor bank failed to demonstrate at the time of the sales by Mr. Alexander that he had *both* an intent to harm the property of the bank, and, further, that the property sold was, in fact, the property of the bank, the bankruptcy court correctly found that creditor bank

424

had failed to prove the essential elements of section 523(a)(4).

### 11 U.S.C. § 727(a)(2) and § 727(a)(5) Relief

Finally, creditor bank asserted below that 11 U.S.C. § 727(a)(2) prevented the discharge of the debt owed by Mr. Alexander. This section provides:

(a) The court shall grant the debtor a discharge, unless

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

The bankruptcy court held that there was no evidence presented of any intent on the part of Mr. Alexander to hinder, delay, or defraud a creditor. Again, this conclusion must be affirmed by this court because of the fact that the bankruptcy court found that the sales of pigs prior to the summer of 1983 were not made with an intent to harm. Furthermore, while the sales of pigs made after this meeting were done with an intent to harm creditor bank, the bank failed to demonstrate a valid security interest in the collateral sold. The assets derived from these sales were utilized by Mr. Alexander in maintaining his troubled farming operation. These assets, therefore, were not transferred in a manner that would defraud the bank because, as a mere general creditor in these assets, the bank's security was not affected.

With respect to creditor bank's contention that 11 U.S.C. § 727(a)(5) barred the bankruptcy court from granting a discharge on the debt in question, this court finds that this issue was not raised in the bankruptcy proceedings by creditor bank,

nor was it raised on appeal. *See* Statement of Issues on Appeal dated November 23, 1984, filed by appellant/creditor bank. It was first raised in creditor bank's brief filed in conjunction with its appeal. The court, therefore, finds this issue not to be properly before it since it appears to have been waived in the proceedings below.

Accordingly, the court finds for the foregoing reasons that the bankruptcy court properly held the debt owing to the Farmers & Merchants Bank of Eatonton by Mr. Clyde F. Alexander to be dischargeable in bankruptcy, and, therefore, AFFIRMS the decision of the bankruptcy court.