In the Matter of Gerald C. BARTON, Individually and d/b/a Sher-Bar Land and Cattle Co. and d/b/a Sher-Bar Land and Cattle, Bankrupt.

Ernest GAFNI, Plaintiff-Appellant,

v.

Gerald C. BARTON, Defendant-Appellee.

No. 76 B 574.

United States District Court,
S. D. New York.

Jan. 18, 1979.

Samuel Rosenberg, New York City, for plaintiff-appellant.

Ephraim Leibowitz, Krause Hirsch & Gross, New York City, for defendant-appellee.

## DECISION

EDELSTEIN, Chief Judge:

This appeal to the District Court from an order of Bankruptcy Judge Howard Schwartzberg involves an attempt by Ernest Gafni, the appellant to bar the discharge of his claim against the bankrupt, appellee Gerald Barton, who seeks dismissal of Gafni's complaint.

## FACTS

On October 9, 1973, Gafni entered into a written agreement with Sher-Bar Management Corp., by which he loaned $100,000 to the corporation. Barton, an attorney who had represented Gafni in the past, was the President of Sher-Bar Management Corp. at this time and Word B. Sherrill, Jr. was the Vice President/Secretary. Pursuant to the terms of this agreement, Barton and Sherrill personally guaranteed the promissory note of Sher-Bar Management Corp.

Barton and Sherrill formed a partnership known as Sher-Bar Land and Cattle Co., which acquired land in Pecos County, Texas, for $1,100,000. Sherrill assumed the management and operation of the cattle ranch and maintained the books and records in his office in Texas. Barton invested approximately $150,000 of his own money in the venture. Sher-Bar Management Corp., from which Gafni was to receive monthly installments of $1,100 as interest on the loan, made the interest payments directly to Gafni by checks signed by Sherrill in Texas.

Gafni entered into a written agreement with the Sher-Bar Management Corp. dated August 1, 1974 by which he loaned the corporation an additional $25,000. This agreement terminated the contract of October 9, 1973, while substantially duplicating its terms, including Barton's and Sherrill's personal guarantees of the promissory note of Sher-Bar Management Corp., as well as payment to Gafni of interest in ten equal monthly installments in the amount of $1,600. These payments were made.

In June, 1975, Barton informed Gafni that they had "a bad crop" and requested that the latter roll over the loan. Consequently, Gafni and Sher-Bar Management Corp. entered into a new loan agreement dated June 30, 1975 which terminated the contract of August 1, 1974. The new agreement was patterned after the two previous agreements and again provided for Barton's and Sherrill's personal guarantees and for payment of interest in equal monthly installments through March 1, 1976. This loan agreement also included a provision for repayment of the principal balance at the rate of 13% per annum as of March 31, 1976.

Sher-Bar Management Corp. made monthly payments pursuant to the loan agreement through December 1975. In early January, 1976, Gafni did not receive the installment that was due on the first of the month and relayed this information to Barton who thereupon contacted Sherrill in

Texas. Barton advised Gafni that some problems had developed with respect to the cattle ranch venture and requested that Gafni forbear collection. Gafni agreed, on January 16, 1976, to postpone collection of the monthly payments until March 31, 1976. The consideration was an assignment by Barton of 1,630 shares of Towbar Apartments, Inc., held by Barton and another as tenants in common, as additional security for the loan. Although Gafni received from Barton an executed stock power over the latter's interest in the 1,630 shares, the shares were held by a law firm under claim of attorney's lien, and were never delivered into escrow for Gafni's security as required by the agreement of January 16, 1976.

Barton visited the cattle operation in Texas and discovered that Sherrill had both mismanaged and mortgaged the property to the point that "the business was wiped out." [1] Barton's personal finances had also suffered. As the bankruptcy court determined, "[i]n retrospect, the bankrupt's financial status in January 1976 was not worth the confidence that the plaintiff exhibited in accepting it." [2]

On March 11, 1976, Barton filed a voluntary petition in bankruptcy. Gafni filed a timely complaint to recover from Barton, as guarantor, the debt of Sher-Bar Management Corp. as a debt not dischargeable in bankruptcy. Barton was thereafter adjudicated bankrupt and Gafni now appeals from an order of the bankruptcy judge dismissing his complaint after a trial. Gafni argues that the bankruptcy court erred in determining that the facts as related above do not give rise to claims against Barton that are nondischargeable pursuant to Bankruptcy Act sections 17(a)(2), (4), and (8), 11 U.S.C. sections 35(a)(2), (4), and (8) (1976). Additionally, Gafni attacks specific findings of fact upon which the bankruptcy court premised its determination. Believing that the court below correctly decided the law, and that no pertinent findings of

---

1. *In re Barton,* No. 76 B 574, Decision on Application of Ernest Gafni To Have Debt To Him Determined Nondischargeable, Finding of Fact 29 (Oct. 8, 1976) (hereinafter "F.F.").

2. F.F. 30.

fact are clearly erroneous, Bankruptcy Rule 810, 11 U.S.C.App. (1976), this court now affirms.

## DISCUSSION

### I.  Section 17(a)(2)

This section provides:

(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as  .  .  .  (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another  .  .  ..

At the outset, we must reject Gafni's novel assertion that the attorney-client relationship between Barton and him, coupled with a conflict of interest relating to the instant debt, renders Barton's conduct a fraud that is nondischargeable by force of the provision recited above.  It has long been understood that the salutary purposes of the Bankruptcy Act require confining exceptions to discharge of a debt to those plainly stated in section 17.  *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Danns v. Household Finance Corp.,* 558 F.2d 114 (2d Cir. 1977).  The 1903 amendment to the Act eliminated the requirement of a pre-existing judgment to bar discharge, thus broadening the exception, but substituted for the generalized "fraud" ground the narrower formulation "false pretenses or false representations." A reading of the cases under the 1903

amendment makes it clear that Gafni's thesis is unsupportable.  Fraud implied in law from the relationship of the parties alone, "which may exist without imputation of bad faith or immorality, is insufficient" to bar discharge under section 17(a)(2).  1A Collier on Bankruptcy ¶ 17.16[3] at 1634 (14th ed.) (footnote omitted) (hereinafter "Collier").  Therefore, the bankruptcy judge properly put Gafni to his proof of specific, intentional false pretenses or false representations.

Gafni proffers a long list of actions and statements by Barton as "false pretenses" and "false representations."  Those meriting detailed consideration are discussed below.

Gafni contends that Barton falsely represented that the loan was to be "fully secured," apparently by mortgage of the Texas property, whereas in fact this full measure of security was not given.  In reviewing the circumstances surrounding the loan agreements the court agrees with the Bankruptcy Judge's finding that the so-called security referred to in these agreements was clearly and expressly described as consisting of a promissory note and the personal guarantees of Barton and Sherrill.  In none of the loan agreements was there any reference to security consisting of a mortgage covering the cattle ranch.  Nonetheless, Gafni made the loans despite the absence of any reference to collateral consisting of a mortgage of the Texas property.[3]

Second, Gafni lists various circumstances of the January 16, 1976 forbearance agreement as evidencing false pretense and false representation.  The *quid pro quo* for such forbearance was Barton's agreement to assign his interest in 1630 shares of Towbar Apartments, Inc. as additional security for the underlying debt.  Such stock was of

---

**3.** The subjective nature of the reliance element in misrepresentation cases fortifies the conclusion that Gafni was not misled as to the kind or amount of security to be given.  *See* W. Prosser, Law of Torts, 716–17 (4th ed. 1971).  Gafni was not an entirely unsophisticated investor. His testimony indicates that he had engaged in various investment activities, some of which

involved mortgages, before he made the loans to Barton.  *See* trial transcript at pp. 58, 60, 88–89.  Indeed, Gafni had transacted business under the trade name of Gafni Investments, as evidenced by the certificate he filed with the Westchester, N. Y., County Clerk's office on January 2, 1970.

relatively small worth in comparision with the debt. It was held by a third party under claim of attorney's lien and thus could not be transferred, and the extent of Barton's knowledge and disclosure of such facts is not clear on the record. Taken together these circumstances counsel close scrutiny of Gafni's section 17(a)(2) claim, yet the court is convinced they fall short of constituting a bar to discharge of the debt.

First, Gafni has not convinced this court that the forbearance agreement respecting a pre-existing debt amounts to receipt of "money or property" by Barton as required by section 17(a)(2). The court below held that it was not.

■ The instant transaction does not fall neatly within the terms of the provision, but can best be treated under the clause in 17(a)(2), quoted above, referring to an "extension or renewal of credit." This language was added to section 17(a)(2) in 1960, Pub.L. No. 86–621, 86th Cong., 2d Sess., 74 Stat. 409 (1960), when the provision respecting a false written financial statement was removed as a section 14 ground against discharge and added as a section 17(a) ground for nondischargeability of a specific debt. See Senate Report No. 1688, 86th Cong., 2d Sess. (1960), reprinted in [1960] U.S.Code Cong. & Admin.News, p. 2954. The amendment clarified the pre-existent confusion whether an extension of credit was to be deemed "obtaining money or property." Compare, e. g., Personal Finance Co. v. Bruns, 16 N.J.Super. 133, 84 A.2d 32 (1951) with Guedry Finance Co. v. McCubbin, 120 So.2d 298 (La.App.1960); see 1A Collier ¶ 17.16[2] at 1631 n.9. However, we read the "extension or renewal of credit" ground as limited to cases of written financial statements. It is possible that Congress intended by the 1960 amendment to declare that "money or property" had always included renewals of credit, but the plain language of the amended provision does not support this. There is a patent asymmetry between the language "obtaining money and property," and "obtaining money or property on credit or obtaining an extension or renewal of credit. . . ." Therefore, absent any indication that the forbearance agreement was induced by a "false statement in writing respecting [Barton's] financial condition," we cannot conclude that the forbearance agreement supports nondischargeability under 17(a)(2). Moreover, Gafni's only specific allegation of false representation involving the forbearance agreement is that the value of the additional security was "nowhere near equal in value to the $125,000 debt," Plaintiff-Appellant's Memorandum at 4. The record and findings below do not support the contention that Barton represented the worth of the collateral to be equal to the debt, or that Gafni relied on this or any other particular representations in assenting to the proposed forbearance.[4] We conclude by noting that Gafni's failure to pinpoint false statements on which he relied defeats his argument even if the forbearance is considered obtaining "money or property" by Barton, for it is settled that reliance must be shown to recover under section 17(a)(2) quite aside from the express language respecting a written statement of financial condition. 1A Collier ¶ 17.16 at 1636 & n.7.

Gafni next contends that various nondisclosures by the bankrupt bring the instant loan transactions within the ambit of section 17(a)(2). Without deciding the thorny question when if ever the nondisclosure of material facts or intentions is a section 17(a)(2) "false representation,"[5] we must

---

4. Again we note that Gafni's previous investment activity supports the determination that he was not a wholly unaware neophyte duped into the contract by Barton. See footnote 3 supra.

5. Most cases of alleged fraudulent nondisclosure seem to arise in consumer credit transactions and deal with statements of personal financial condition. The seminal case Davison-

Paxon Co. v. Caldwell, 115 F.2d 189 (5th Cir. 1940), cert. denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941) held that nondisclosure of insolvency by a credit purchaser did not constitute a § 17(a)(2) false representation. The decision has been followed quite recently, see Sears, Roebuck & Co. v. Wood, 571 F.2d 284 (5th Cir. 1978) (no evidence that bankrupt did

reject Gafni's argument. His broad assertion that Barton failed "to make any disclosure to the client in an obvious conflict of interest situation," Plaintiff-Appellant's Memorandum at 3, is not supported by the record.

First, the record reveals no "concealment of the operations themselves or the defalcations by bankrupt's partner, Sherrill," Plaintiff-Appellant's Memorandum of Law at 4, as Barton apprised Gafni of difficulties with the ranch as Barton himself became aware of them.[6] Second, Gafni's citations to the record are entirely too sparse to support a finding that Barton, as guarantor, misled Gafni with regard to the former's personal finances.[7] Third, and most importantly, it is clear beyond cavil that Barton did not conceal his conflict of interest from Gafni.[8] At all times Gafni was aware that Barton was a principal of Sher-Bar Management Corp. and that Sher-Bar Management Corp. was a shell through which Gafni could advance funds to Barton's partnership, Sher-Bar Land and Cattle Co.

■ For these reasons, section 17(a)(2) does not operate to prevent discharge of the instant debt.

## II. Section 17(a)(4)

This section provides:

(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as   .   .   .   (4) were created by his fraud, embezzlement, mis-

appropriation or defalcation while acting as an officer or in any fiduciary capacity
.   .   .   .

In the course of Barton's transactions with Gafni concerning the loan to Sher-Bar Management Corp., Barton occupied dual roles. On the one hand, he was Gafni's attorney who directed the drafting of the loan agreements in question by another lawyer in his office. On the other hand, Barton was also a principal of the borrowing corporation and a personal guarantor of the loan to the corporation by Gafni. This conflict of interest, standing alone, is not a "fraud, embezzlement, misappropriation, .or defalcation" within the meaning of the statute. The intent of the statute, as connoted by these words, requires, as a threshold, that the bankrupt hold property in trust. The cases under section 17(a)(4) regarding attorneys as fiduciaries are united in their prohibition of attorney conduct that affects funds or other property *entrusted* to the attorney, under a retained claim of equitable title by the client. *See, e. g., In re Kane*, 48 F.2d 96 (2d Cir. 1931); *In re Gelson*, 12 F.Supp. 924 (E.D.N.Y.1935); *In re Riley*, 266 App.Div. 160, 43 N.Y.S.2d 753 (1943).

Also distinguishable on this ground are cases principally relied on by Gafni. In *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir. 1937), a receiver appointed in a mortgage foreclosure who spent an allowance granted pursuant to an intermediate accounting was deemed guilty of "defalcation" sufficient to bar discharge when the allowance was denied on appeal. And in *Macedonia v. Fontanelli*, 9 App.

---

not intend to pay for merchandise), but has also been criticized. *Sears, Roebuck & Co. v. Boydston*, 520 F.2d 1098 (5th Cir. 1975); *In re Black*, 373 F.Supp. 105 (E.D.Wis.1975); 1A Collier ¶ 17.16[3] at 1640 n.23.

**6.** In June 1975, Barton informed Gafni that they had a "bad crop," F.F. 17, soon before the final renewal and re-writing of the loan agreement occurred. Similarly, the forbearance agreement of January 16, 1976 was preceded by Barton's disclosing to Gafni "that some problems had developed with respect to the cattle ranch venture." F.F. 21. It was at approximately the same time that that agreement was concluded that Barton traveled to Texas to

observe the full extent of Sherrill's activity. *See* F.F. 29; trial transcript at 274–79.

**7.** F.F. 34 (plaintiff failed to sustain burden on this point).

**8.** Gafni signed a letter dated January 16, 1976 in which he purports to have knowledge of Barton's conflict and to be independently represented by a William A. deLorenzo, Esq., an associate of Barton. F.F. 23. Because this letter was drafted at Barton's instance, we need not accept it at face value. Still, it surely put Gafni on notice of Barton's conflict of interest.

Div.2d 928, 195 N.Y.S.2d 42 (1959), funds explicitly "entrusted" to the attorney to invest for his client's account were converted to the attorney's personal use, and such debt was held nondischargeable.

■ The present case is not controlled by those cases that have brought attorneys' liabilities within section 17(a)(4) on the basis of a fiduciary relationship. "While one does not enter into a contract with another unless he trusts and has confidence in him, contract and debt amount to a business and not to a fiduciary relationship." G. Bogert, Trusts and Trustees § 17 at 107 (2d ed. 1965) (footnote omitted). Although Gafni may have reposed in Barton the confidence and reliance that properly mark the attorney-client relationship in some aspects of the instant transaction, the deal was in substance a loan to Sher-Bar Management Corp. for use by Sher-Bar Land and Cattle Co. It is noted again that Barton did not conceal his dual capacity as attorney and guarantor. Gafni was aware at all relevant times that Barton was a principal of Sher-Bar Management Corp. Barton was a contingent debtor by reason of his personal guarantee, and Sher-Bar Management Corp. had the right to the use of the loan, subject only to the duty to repay it. In sum, it was the intention of both parties that a lender and borrower relationship would be created.

■ For this reason, section 17(a)(4) does not prevent discharge of the instant debt.

### III. Section 17(a)(8)

This section provides:

(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (8) are liabilities for willful and malicious injuries to the person or property of another

. . . . .

Many earlier decisions under this provision, and under a similar provision in section 17(a)(2) respecting willful and malicious conversion, have limited its application to cases sounding in tort, not in contract. 1A Collier ¶ 17.17 at 1650.3 (citing cases). Others have questioned this compartmentalized construction of the section. Yet it is instructive that decisions holding liabilities formally grounded in contract nondischargeable by force of section 17(a)(8) have involved, in some respect, recognizable intentional torts such as are regularly deemed comprehended within the section. In *National Homes Corp. v. Lester Industries*, 336 F.Supp. 644, 647 (W.D.Va.1972), the fact that the contract breach was an "independent, wilful [sic] tort" under state law was an alternate ground to deny discharge. In *Rivera v. Moore-McCormack Lines, Inc.*, 238 F.Supp. 233 (S.D.N.Y.1965), bankrupt's breach of his employment contract was held nondischargeable where it consisted of assault. Similarly, in *Western Surety Co. v. Rich*, 141 F.Supp. 872 (W.D.Okla.1956), a surety's claim against its bankrupt principal, although emanating from the suretyship contract, was nondischargeable as the surety had paid a judgment for assault and battery by the bankrupt. These cases counsel against summarily excluding contract-based liabilities from section 17(a)(8). Yet they also belie the argument that ordinary contract breaches and every species of unpaid debt will, as a matter of course, be exposed to a characterization as "willful and malicious" injury.

■ The words "willful and malicious" do not import any sense of spite, hatred, or ill will—"special malice"—but only mandate that the questioned act be done " 'deliberately and intentionally in knowing disregard of the rights of another.' " *In re Nance*, 556 F.2d 602, 611 (1st Cir. 1977), quoting *Bennett v. W. T. Grant Co.*, 481 F.2d 664, 665 (4th Cir. 1973).

In the present case, the bankruptcy court found that Barton did not intend to injure Gafni's property rights. Clearly the court meant, to use Collier's more precise statement of the rule, that Barton did not intentionally perform unjustified acts necessarily causing injury. *See* 1A Collier ¶ 17.17 at 1652. It is manifest that both Gafni and Barton hoped to derive profit from the venture. The use of the loan presents at most

a case of neglect by Barton and negligent mismanagement by Sherrill. Gafni's brief, although slightly opaque on this point, seems to admit as much: "The essence of the plaintiff's claim against the bankrupt is negligent malpractice by the bankrupt in the attorney-client relationship." Plaintiff-Appellant's Memorandum of Law 16–17. If Gafni means to argue that Barton's efforts to procure the loans, and the forbearance, amount to "willful and malicious injury," we have found nothing beyond the arguments already refuted under section 17(a)(2), *supra*, to sustain the contention.

■ For these reasons, section 17(a)(8) does not prevent discharge of the instant debt.

## CONCLUSION

1. The appellant's claim against the appellee does not constitute a liability for obtaining money or property by false pretenses or false representations within the meaning of section 17(a)(2) of the Bankruptcy Act.

2. The appellee's liability to the appellant was not created by fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity, as defined in section 17(a)(4) of the Bankruptcy Act.

3. The appellee's indebtedness to the appellant is not a liability for willful and malicious injuries to the property of the plaintiff, as proscribed under section 17(a)(8) of the Bankruptcy Act.

Finally, given Gafni's heavy, although misplaced, reliance on the Code of Professional Responsibility as a basis for nondischargeability, we hasten to add that the court's decision is not condonation of any of Barton's actions in this case.

The order of the bankruptcy judge, dismissing plaintiff's complaint, is affirmed. The clerk will enter judgment with costs.

SO ORDERED.