In re Morton H. SPAR, Debtor.

Jack KUPER, Plaintiff,

v.

Morton H. SPAR, Defendant.

Bankruptcy No. 88–B–12665(PBA).
Adv. No. 89–5528A.

United States Bankruptcy Court,
S.D. New York.

Feb. 22, 1994.

Bondy & Schloss by Jacqueline I. Meyer, New York City, for Jack Kuper.

Elman & Weiss, P.C. by Matthew J. Weiss, New York City, for Morton H. Spar.

Lynn P. Harrison, Chapter 7 Trustee, Curtis Mallet–Provost Colt & Mosle, New York City.

### MEMORANDUM DECISION
### AFTER TRIAL

PRUDENCE BEATTY ABRAM, Bankruptcy Judge:

Shakespeare could have had the facts of this case in mind when he wrote: "Neither a borrower nor a lender be,/for loan oft loses both itself and friend * * * " *Hamlet*, Act 1, Scene 3.

This adversary proceeding was commenced by Jack Kuper ("Kuper") to obtain a declaration that a $100,000 personal loan made to the debtor is nondischargeable under Bankruptcy Code §§ 523(a)(2)(A) and 523(a)(4). The debtor Morton H. Spar ("Debtor" or "Spar") filed an answer denying the essential elements of the complaint.

Kuper contends that the $100,000 loan obtained by Spar is nondischargeable under two theories. First, Kuper claims that this loan was procured by false pretenses, false representations or fraud under Code § 523(a)(2)(A) in that Kuper only agreed to make the loan upon Spar's promise to execute a promissory note, issue to him certain stock in Sheridane Designs Ltd., Inc. ("Sheridane") and name him to Sheridane's Board of Directors. Complaint at ¶ 6. To this end, Kuper alleged that the Debtor, intending to deceive him, misrepresented that he would issue a promissory note and perquisites attendant to getting in on the ground floor of a business opportunity and that Kuper relied upon these misrepresentations to his detriment.

Alternatively, Kuper bases his dischargeability objection on Spar's alleged fraud or defalcation while acting in a fiduciary capacity within the meaning of Code § 523(a)(4). Complaint at ¶ 15. Specifically, Kuper argues that due to the close relationship between the parties and his relative business inexperience, or naivete as compared to the

superior knowledge of Spar, a fiduciary relationship existed and was breached.

A full day trial was conducted on April 20, 1993. Kuper presented his case through his testimony and that of his wife Diana ("Diana"). The Debtor did not offer any testimony or evidence beyond the verified complaint at trial. The court requested and received from the parties post-trial memoranda of law.

For the reasons discussed below, this court finds that Kuper has demonstrated by a preponderance of the evidence that the loan should be excepted from discharge under Code § 523(a)(2)(A). However, Kuper has failed to sustain his burden of proof under Code § 523(a)(4) and the complaint is dismissed with prejudice with respect to the second cause of action. The court's findings of fact and conclusions of law follow.

### *Facts*

The Debtor and Kuper first met in 1975 when Kuper, a retailer by profession, purchased wholesale goods from a number of businesses with which the Debtor was connected. Even though Kuper resided in Florida and the Debtor primarily resided in New York, between 1975 and 1988 they developed a social relationship and became very close personal friends. Kuper testified that he treated and considered Spar like family and the Debtor was the godfather of Kuper's only son.

In 1986 Spar was Chairman of the Board of Directors of Sheridane and together with Michael Kellerman ("Kellerman") owned all issued and outstanding common stock of the company. In September, 1986, Spar advised Kuper that he intended to buy-out Kellerman and take Sheridane public.

The mechanics of buying out Kellerman necessitated the incorporation of a second entity known as S–D Designs, Inc. ("S–D Designs"). Spar, through S–D Designs, embarked upon a private offering of debt securities to raise capital to fund the purchase of Kellerman's shares. As stated in the S–D Designs Private Placement Memorandum dated December 29, 1986, S–D Designs planned to sell 40 securities units at a price of $50,000 per unit and issue a $50,000 promissory note in return. After the purchase of Kellerman's stock was completed, S–D Designs and Sheridane would merge and a public offering would be undertaken. Each unit sold under the private placement memorandum would be exchanged for 12,500 shares in Sheridane, common stock purchase warrants and a $37,500 promissory note of Sheridane. The planned public offering of Sheridane ultimately did not occur.

Kuper did not want to invest in Sheridane or participate in the buy-out of Kellerman. He would not invest because of his belief, shared by his wife Diana, that Spar had seriously overvalued Sheridane and Kellerman's stock and that the market for Sheridane's products had declined dramatically. Diana testified that she and her husband had discussed Spar's planned buyout of Kellerman with three other people in the men's wear industry and all agreed that it was not a good investment. Tr. at p. 123 [1]. Additionally, Kuper testified that the investment was too risky for his investment portfolio. Although he considered himself a safe investor who stayed away from anything highly speculative or leveraged, Kuper was a somewhat sophisticated investor who appeared to favor investment opportunities which lend themselves to prestige and/or tax write-offs. Kuper had previously made investments in Appaloosa horses, farm land, Miami real estate and three banks.

After Spar began asking Kuper to loan him $100,000 in September, 1986, Kuper agreed to make the personal loan. Kuper had loaned money to Spar many times during their friendship. Usually the amount was under $10,000 and Spar would arrange to return the money quickly and without incident. Promissory notes were not executed for these smaller loans. Spar felt that he was "morally compelled and obligated to lend [Spar] the money". Tr. at p. 70. Diana confirmed her husband's strong desire to help his friend. She testified that the decision to help her husband's dear friend was not made with the mind but came from the

---

1. April 21, 1993 Trial Transcript, hereinafter "Tr.        at p. ——".

heart. Tr. at pp. 127–28. In December 1986 the loan arrangement was finalized.

Although he did not testify at the trial, Spar urges in his answer to the complaint that Kuper did not make a personal loan to him but rather purchased two units in S–D Designs. Answer at ¶ 3. Although Kuper did receive a $75,000 promissory note from Sheridane, Tr. at p. 93, 50,000 shares of common stock in Sheridane, Tr. at p. 103, and the private placement memorandum together with correspondence from the New Jersey law firm handling the transaction, these facts, standing alone, are insufficient to infer that the transaction involved solely an investment in Sheridane in light of Kuper's uncontroverted testimony concerning the basis for the loan. In addition, Diana testified that she telephoned Spar and he confirmed to her that the transaction was a personal loan, separate and apart from Sheridane. Tr. at p. 124.

In exchange for the $100,000 loan, Kuper testified that he was to have received many benefits. Specifically, he believed that Spar would provide him with the following:

> " * * * I was going to be a member of the Board of Directors of Sheridane. He told me he was going to be mailing me a promissory note. He was telling me he was going to pay the interest because I had to borrow the money from the bank. He on several occasions told me that I was going to be able to receive a lot of perks, such as limousines picking me up, because he owned a limousine or his company owned a limousine, whomever; that I was going to have access to buying theater tickets and charge it to the company; that I was going to be able to go out for dinners and charge it to the company; that I was going to get special prices on the merchandise he sold to other people at lower prices * * * "

Transcript at p. 73–74.

On December 26, 1986, Kuper sent the Debtor by overnight mail a check payable to "S and D Corp." for $100,000. Spar was described by both Kuper and Diana as desperate to receive the check over Christmas weekend. The check was drawn to S and D Corp. at the request of Spar. Before forwarding the check to Spar, Kuper told him that he did not have sufficient funds in his personal account but that he would need to borrow the money from a bank. Spar was therefore directed to hold the check until Kuper was able to cover it with borrowed funds. Kuper testified that Spar agreed to hold the check until it was good but nevertheless deposited on January 8, 1987. After receiving a telephone call from his bank, Continental Bank, that the $100,000 check had been presented for payment, Kuper signed a promissory note in favor of the bank in the amount of $100,000 on January 12, 1987.

Throughout 1987, Kuper requested that Spar forward a promissory note to him. Each request was met by Spar with a promise that his attorney was working on it and that he would never let Kuper down. Kuper did not request that his own personal attorney prepare a promissory note and forward it to Spar. In fact, Kuper specifically instructed his attorney not to contact Spar since the debt was a personal matter. Tr. at pp. 102–103.

Obtaining a promissory note from Spar was very important to Kuper. Kuper had never requested a promissory note for any of the other monies he had advanced to Spar over the years, but this loan was for a substantial amount of money that Kuper would have to borrow. Kuper prided himself on being a "man that believes in words" and someone who "did not want to start making papers for every transaction" he does. Tr. at p. 56. Kuper went on to relate that he:

> " * * * had built 19 stores in the Miami area with about four or five contractors. You can ask any contractor if they ever had a signed agreement between him and I, and I have never been involved in disputes of this nature with monies because I do respect the worth of a human being and after 11 years of having such a close-knitted relationship, I didn't feel it was necessary to start writing papers for every transaction."

Tr. at p. 56. However, in 1988, after requesting that Spar begin paying the money back at the rate of $100 per month as a show

of good faith, and being rebuffed, the Kupers realized that they might not be repaid.

Neither Spar, Sheridane nor S–D Designs has repaid the $100,000, or any portion thereof, to Kuper. On December 13, 1988, Spar filed a Chapter 7 bankruptcy petition.

## Discussion

### Code § 523(a)(2)(A) Claim

■ Any discussion of dischargeability must recognize the two competing objectives of bankruptcy. First, a fundamental goal is to afford an honest and deserving debtor an economic "fresh start". The Supreme Court has observed that:

> " * * * [o]ne of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor * * * a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." (citations omitted).

*Local Loan Company v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1933) quoting *Williams v. U.S. Fidelity & Guaranty Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915). A second and equally important purpose of bankruptcy is to prevent the dishonest "debtor's attempts to use the law's protections to shield his or her wrongdoing." *Matter of Newmark,* 20 B.R. 842, 852 (Bkrtcy.E.D.N.Y.1982).

■ The Code contains several specific and well-defined circumstances when a discharge of a particular debt may be denied. To meet the goals intended under the Code, exceptions to discharge must be strictly and literally construed against the creditor and liberally construed in favor of the honest debtor. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Danns,* 558 F.2d 114, 116 (2d Cir.1977); *In re Barton,* 465 F.Supp. 918, 921 (S.D.N.Y. 1979); *In re Boice,* 149 B.R. 40, 43 (Bkrtcy. S.D.N.Y.1992). A creditor alleging the non-dischargeability of a debt under Code § 523(a) must prove by a preponderance of the evidence that each element has been met. *Grogan v. Garner,* 498 U.S. 279, 285, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *In re Schwartz & Meyers,* 130 B.R. 416, 422 (Bkrtcy.S.D.N.Y.1991).

■■ Code § 523(a)(2)(A) provides that a debtor may be denied a discharge from any debt that was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition". Code § 523(a)(2)(A). To establish that a debt is not subject to discharge under this section, a creditor must prove five elements:

(1) the debtor made a representation;

(2) the debtor knew the representation was false at the time it was made;

(3) the representation was made with the intent to deceive the creditor;

(4) the creditor relied on the representation; and

(5) the creditor was injured by the representation and suffered damages as a result. *In re Shaheen,* 111 B.R. 48, 51 (Bkrtcy. S.D.N.Y.1990); *Schwartz & Meyers,* 130 B.R. at 422; *In re Gans,* 75 B.R. 474 (Bkrtcy. S.D.N.Y.1987); *Boice,* 149 B.R. at 44; *In re Jacone,* 156 B.R. 740, 743–44 (Bkrtcy. S.D.N.Y.1993). The failure to prove any of these elements is fatal to the plaintiff's case. *Gans,* 75 B.R. at 483. However, once a creditor has established a prima facie case under Code § 523(a)(2)(A), the debtor then has the burden of going forward with his defense. *Newmark,* 20 B.R. at 853, *Carini v. Matera,* 592 F.2d 378, 380–81 (7th Cir.1979).

■ The representations made by Spar to Kuper fall into two categories. First, Spar made various representations about Kuper getting in on the ground floor of a business opportunity and being named to the board of directors of the publicly traded Sheridane. Included in this category of representations was also a promise of stock in Sheridane and the opportunity to experience the benefits of board membership which Kuper described as

gratuitous car service, theater tickets and dinners while visiting New York City. In the second category was Spar's promise to execute a promissory note in favor of Kuper.

▉▉▉ The first element of this five part test requires the determination of whether there was a false representation or false pretense. In order for Spar's representations to be a false representation or false pretense under Code § 523(a)(2)(A), the representations must "encompass statements that falsely purport to depict current or past facts". *In re Roeder*, 61 B.R. 179, 181 (Bkrtcy.W.D.Ky.1986). A promise to perform in the future is insufficient. *Matter of Allison*, 960 F.2d 481, 484 (5th Cir.1992); *In re Bercier*, 934 F.2d 689, 692 (5th Cir.1991); *Roeder*, 61 B.R. at 181; *In re Balzano*, 127 B.R. 524, 531 (Bkrtcy.E.D.N.Y.1991). Thus, Code § 523(a)(2)(A) contemplates positive fraud or fraud involving "moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient." 3 L. King *Collier on Bankruptcy*, § 523.08[4] (15th ed. 1990).

▉▉▉ Clearly, those representations alleged in the Complaint and adduced at trial relative to Sheridane are not actionable under Code § 523(a)(2)(A). Each of these representations, while admittedly important to Kuper, constitute a representation as to a future act. Representations as to opinion, expectation or declarations of intention do not relate to existing fact and are not actionable. *See, Schwartz & Meyers*, 130 B.R. at 423; *In re Showalter*, 86 B.R. 877, 880 (Bkrtcy.W.D.Va.1988); *In re Criswell*, 52 B.R. 184, 197 (Bkrtcy.E.D.Va.1985). Viewing the promises which related to Sheridane in their most favorable light, it is clear that each relates to Spar's expectations for his company and hope that Kuper would join him in Sheridane as a board member. Only

when the debtor "does not hold these opinions or utters them with reckless indifference for their truth" can the requisite fraud be found. *Schwartz & Meyers*, 130 B.R. at 423; *See also, Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985). There was insufficient evidence to find that Spar did not hold these opinions or uttered them with reckless indifference for their truth.

▉▉▉ The second statement relied upon by Kuper was that Spar expressly represented that he would execute a personal promissory note for the $100,000 loan payable within six months. When, at the time a representation is made, the debtor has no intention of performing as promised, a debtor's misrepresentation of his intentions will constitute a false representation under Code § 523(a)(2)(A). *See, Allison*, 960 F.2d at 484. The court had the opportunity to listen to the testimony and evaluate the credibility and demeanor of the witnesses. The court finds that Spar did in fact misrepresent his intentions and did not intend to execute a promissory note. Had Kuper known that Spar would not execute the note, he would not have advanced the monies to Spar or borrowed funds from the bank.

▉▉▉ There is a split in authority over whether the reliance under Code § 523(a)(2)(A) must be reasonable, a requisite for exceptions to discharge under Code § 523(a)(2)(B)[2]. Several courts have held that Code 523(a)(2)(A) imposes a requirement that the reliance be reasonable notwithstanding its absence in the statute. *See, e.g., In re Lane*, 937 F.2d 694, 698 n. 8 (1st Cir.1991) (recognizing dispute); *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986) *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir. 1985); *In re Pitt*, 157 B.R. 585, 589 (E.D.Va. 1991); *In re Spicer*, 155 B.R. 795, 802

---

**2.** Code § 523(a)(2)(B) provides that:
"(a) A discharge under section 727 * * * does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
(B) use of a statement in writing—
(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit *reasonably relied;* and
(iv) that the debtor caused to be made or published with intent to deceive * * *"
(emphasis added).

328

(Bkrtcy.D.D.C.1993); *In re Guerrerio*, 143 B.R. 605, 611 (Bkrtcy.S.D.N.Y.1992); *In re Austin*, 132 B.R. 1, 3 (Bkrtcy.E.D.N.Y.1991); *Balzano*, 127 B.R. at 530; *In re Tesmetges*, 74 B.R. 911, 914 (Bkrtcy.E.D.N.Y.1987) *aff'd*, 86 B.R. 21 (E.D.N.Y.), *aff'd without opinion*, 862 F.2d 304 (2d Cir.1988). Other courts have held that the more rigorous standard of reliance is inapplicable and a creditor need only show actual reliance. *See, e.g., Allison*, 960 F.2d at 485; *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987); *In re Fosco*, 14 B.R. 918, 921–22 (Bkrtcy.D.Conn.1981); *In re Shaheen*, 111 B.R. at 51. This court need not determine whether the more exacting "reasonable" standard of reliance is applicable given that even under this more rigorous standard, it is clear that Kuper's reliance on Spar's promise to execute a promissory note was reasonable.

■ A long standing friendship or close personal relationship weighs heavily in favor of finding reasonable reliance. *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986) (the parties had known each other 25 years and there was no reason for the creditor to distrust the debtor's representation); *In re Sobel*, 37 B.R. 780 (Bkrtcy.E.D.N.Y.1984) (creditors could not be faulted if they believed that due to the personal friendship between the parties the debtor would deal honestly with them). Kuper repeatedly compared his relationship with Spar to that of a brother. There is no doubt that the relationship was close, personal and based on trust. Kuper relied on the honesty of an old and dear friend to his detriment. Additionally, Kuper was required to borrow the funds from a bank, obligating his own funds to assist his friend. In all of his previous dealings with Spar, Kuper had been able to rely on the representations made by the Debtor.

■ The scienter element of a Code § 523(a)(2)(A) claim can be inferred from the totality of the circumstances because direct proof of a debtor's state of mind is generally not available. *In re Wheatley*, 158 B.R. 140, 143–44 (Bkrtcy.W.D.Mo.1993); *Balzano*, 127 B.R. at 531; *Gans*, 75 B.R. at 486; *In re Wood*, 75 B.R. 308, 313 (Bkrtcy.N.D.N.Y. 1987). However, fraudulent intent cannot be presumed. The permissible inference will be negated where the debtor comes forward with some evidence that he did not intend to deceive the plaintiff. *See, e.g., Balzano*, 127 B.R. at 531 (debtor made payments for one year on debt, only filed a Chapter 7 petition when he was no longer able to do so and therefore did not hold intent not to perform); *Gans*, 75 B.R. at 487 (debtor made interest payments for a substantial period of time after receiving loans therefore no intent not to perform). Here, the totality of the circumstances clearly indicates that Spar never intended to execute a promissory note. Spar was keenly aware of the promises he would need to make to convince his friend to make the loan.

The facts of this case demonstrate that Spar did not intend to execute a promissory note in favor of Kuper. At the time of the loan, Spar had been described as desperate to raise cash with the deadline for the Kellerman buyout fast approaching. A promissory note is not a highly sophisticated document requiring a team of lawyers to prepare. Rather, most stationary stores carry pre-printed forms which would have satisfied Kuper's request for a note. Spar was well aware that Kuper did not have $100,000 available to make the loan but would have to arrange to borrow the money from a financial institution. Yet, Spar continued to lead Kuper to believe that he would personally repay the loan. The testimony of both Kuper and his wife supports the inference that at the time Spar promised to execute a promissory note he did not intend to fulfill that promise because of the ease with which this promise could have been satisfied and his continued reassurance that it would be satisfied. There is no evidence on the record that would support a finding of good faith as even the requests for minimal payments and repayment over time were rebuffed by Spar.

Spar's false representation that he would execute a promissory note was relied upon by Kuper to his detriment. Had Spar not made such a representation, Kuper would not have loaned him the money and no monetary harm would have ensued. Conversely, Kuper would have been able to take action on the promissory note if Spar had in fact exe-

cuted one in his favor but defaulted in its payment.

In sum, Kuper has demonstrated by a preponderance of the credible evidence that his $100,000 loan to Spar should be excepted from discharge under Code § 523(a)(2)(A).

### Code § 523(a)(4) Claim

As a second cause of action Spar alleges in his complaint that the $100,000 loan is not dischargeable pursuant to Code § 523(a)(4), which provides in pertinent part that:

"(a) A discharge under § 727 * * * of this title does not discharge an individual debtor from any debt for * * *

(4) fraud or defalcation while acting in a fiduciary capacity."

In order for the debt at issue here to be nondischargeable under this section, Kuper must show that: (1) Spar was acting in a fiduciary capacity at the time of the loan *and* (2) that Spar committed fraud or defalcation in such capacity. *In re Farley,* 156 B.R. 486, 493 (Bkrtcy.W.D.Pa.1993) (emphasis added).

Kuper has not established that Spar was acting in a fiduciary capacity in any of his dealings with him. The broad general definition of a fiduciary—a relationship involving confidence, trust and good faith—is not applicable to a discussion about dischargeability. *See, In re Rausch,* 49 B.R. 562, 564 (Bkrtcy.D.N.J.1985); *In re Schultz,* 46 B.R. 880, 884 (Bkrtcy.D.Nev.1985).

In the context of a challenge to dischargeability, the term "fiduciary" applies only to "express or technical trusts and does not extend to implied trusts, which are imposed by operation of law as a matter of equity". *In re Balzano,* 127 B.R. 524, 532 (Bkrtcy.E.D.N.Y.1991); *See also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Upshur v. Briscoe,* 138 U.S. 365, 375–76, 11 S.Ct. 313, 316–17, 34 L.Ed. 931 (1891). Moreover, the requisite trust relationship must exist prior to the creation of the debt and without reference to it. *See, Davis, supra,* 293 U.S. at 333–34, 55 S.Ct. at 153–54, 79 L.Ed. 393.

Here, Kuper has failed to establish the existence of a fiduciary relationship beyond that of close personal friends. In fact, his pleadings allege a familial type relationship based upon trust and good faith rather than upon independent legal grounds. No authority is cited for the proposition that the close relationship between Kuper and Spar transformed Spar into a fiduciary within the requirements of Code § 523(a)(4), at least on the facts of this case. Accordingly, Kuper cannot prevail on this cause of action.

### Conclusion

Kuper has alleged and proven a viable claim under Code § 523(a)(2)(A). However, he has failed to prove a viable claim under Code § 523(a)(4). Therefore, judgment will be rendered in favor of Kuper on the first cause of action and in favor of the Debtor on the second cause of action.

Settle judgment on notice consistent with this decision.

IT IS SO ORDERED.