**In re Gerald BALZANO, Debtor.**

**Elizabeth FARINA, Plaintiff,**

**v.**

**Gerald BALZANO, Defendant.**

**Bankruptcy No. 190–10058–353.**
**Adv. No. 190–1051–353.**

United States Bankruptcy Court,
E.D. New York.

May 21, 1991.

Andrew E. Gutman, Gutman & Gutman, Mineola, N.Y., for plaintiff.

Wayne J. Price, Brooklyn, N.Y., for defendant-debtor.

## DECISION ON COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT

JEROME FELLER, Bankruptcy Judge.

This is an adversary proceeding brought by Elizabeth Farina ("Farina" or "Plaintiff") against Gerald Balzano ("Balzano" or "Defendant") to have her claim declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or, in the alternative, under 11 U.S.C. § 523(a)(4). Having reviewed, weighed and considered the amended pleadings, amended pre-trial memoranda, trial testimony, documentary evidence, credibility of the witnesses, post-trial submissions and Balzano's Chapter 7 case file, the Court finds that Farina has failed to sustain her burden of proof under both 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4). Accordingly, and for the reasons discussed below, the Court dismisses the instant adversary proceeding. This decision constitutes the Court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

## I. FINDINGS OF FACT

1. On January 8, 1990, Balzano, a veteran policeman and lieutenant on the force of the New York City Housing Police filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York. Balzano lists Farina as a $100,000 unsecured creditor for a personal loan. The remainder of Balzano's debt is comprised of unpaid tax obligations and unsecured credit card debt.

2. Farina is a divorced woman around 48 years of age who suffers from a disabling degenerative spinal and/or back condition, making it difficult for her to work. She resides at 2696 Magee Place in Oceanside, New York, a two family house which she owns. Balzano is a divorced male approximately three years younger than Farina.

3. Farina and Balzano have known each other for most of their lives. They are cousins of sort. More than forty years ago, Farina's uncle (her mother's brother) married Balzano's mother. Farina's uncle was thus also Balzano's stepfather. Until the death of Farina's maternal grandmother in the late 1950's or early 1960's, Farina and Balzano would see each other at family occasions and around the holidays. The next time they saw each other subsequent to the death of Farina's maternal grandmother was at the funeral of Farina's mother in 1973. Thereafter, there was little or no contact between the two for a period of about 15 years.

4. On February 4, 1988, after learning that her uncle was critically ill and in the hospital, Farina called her aunt, i.e., Balzano's mother, and also spoke to Balzano at that time. They spoke for three hours and Balzano asked her out to dinner for the following evening. There was a second extended telephone conversation of around two hours on February 4, 1988 between the two and Farina went to visit Balzano at one of his jobs where he moonlighted as a security officer. They spoke in the car from about 10:00 p.m. to 2:00 a.m. The following evening, February 5, 1988, they went for dinner, arriving at the restaurant at about 7:15 p.m., enjoying each other's company and leaving around 10:30 p.m.

5. The seeds of a close, personal relationship between Balzano and Farina were planted. Following the concentrated reacquaintanceship on February 4 and 5, 1988, Balzano and Farina mutually nurtured and encouraged the development of their relationship. They spoke to each other regularly over the telephone. They would call each other, although most of the calls Balzano would initiate because, as Farina testified, he would call from work since it was "cheaper". (Transcript of 11/13/90 at 32). Balzano would come to Farina's house and Farina would visit Balzano at work. They saw each other between February and July 1988 about 10 or 12 times. The relative modest number of personal meetings was due to Balzano's working at the Coast Guard, at a gas station and as a security officer in addition to his regular work as a housing policeman.

6. Notwithstanding Balzano's extraordinary work regimen, the relationship between Farina and Balzano ripened swiftly. Although they now dispute the nature and extent of mutual disclosures, Farina and Balzano did confide in each other. They both had major problems and their lives seemed to be falling apart. She was sick, with limited financial resources, and poor prospects for future security. Balzano was working all hours of the day and night. He was saddled with a substantial tax burden, owing the Internal Revenue Service between $35,000 and $40,000, and credit card debt. In addition, he was a heavy gambler. Despite his decent paying and secure job with a good pension as a New York City housing policeman, Balzano was laboring under severe financial strains. Virtually his entire regular salary was being garnished by the Internal Revenue Service. He was netting close to $4,000 per month and was taking home only $300 per month.

7. One early morning in late March or April 1988, after completion of his regular 4:00 p.m.–12:00 a.m. policeman's shift, Balzano came over to Farina's house. She knew he was coming. He arrived at 1:00 a.m. and they spoke to 5:00 a.m. Farina gave an account as follows:

He was very tired and we just discussed the jobs and how difficult it was and tiring for him and I was very worried about him.

. . . .

He didn't feel well and we discussed the matter about the jobs and how unhealthy it was for him. He wasn't getting enough sleep and wasn't getting the

right food. You know generalizing like that and I said to him, isn't there anything you can do and he said not really not now. He said I have a problem and he started discussing the problems he had with the IRS and that is why he was working so many jobs. The IRS was taking so much money from his salary. (Transcript of 11/13/90 at 25–26).

8. Subsequent to the early morning conversation in late March or April 1988, Farina and Balzano spoke further about his jobs and commenced discussions to resolve the problems. There was no possibility of Balzano borrowing money. He had no savings, no collateral and his wages were being garnished. Eventually, they discussed taking out a loan secured by Farina's house. These discussions, according to Farina, took place in July 1988 and were triggered by her fear of losing him. Farina testified as follows:

Q Well, did there come a time when you discussed taking a loan on your home?

A Yeah, that was about June, July, he [Balzano] came over [the house] and he told me he couldn't see me any more. I had asked him if he would go to a party and he said he couldn't and he said he was sorry, but he couldn't see me any more because it wasn't fair to me that he had to work so many jobs and he couldn't be with me.

. . . .

Q He told you during July, 1989 that he couldn't see you anymore?

A Right, no '88.

Q I'm sorry, '88. Did you have any further conversations with him after he told you?

A Yes, I was very upset. I was very much in love with him. We discussed not seeing each other and I really got frantic; I didn't want to lose him. So I asked him what could we do. He said well, it would be much easier to pay off a mortgage than to keep having the IRS keep taking everything from him and I said what about if we took a loan. He said well, you have to have a house or something and I said we can take a loan

on my house and he said sure [and] that is what we discussed that night.

Q Did you make a decision that evening with him or by yourself to take a loan on the house?

A No, I thought about it for a while and the pros and the cons. I didn't want to stop seeing him, so I figured that [I] would help him so we could be together.

Q Did there come a time that you did, in fact, make a decision?

A Yes.

Q Do you know when that took place?

A In July, right around the same time.

Q What was your decision?

A To take a mortgage out on the house. (Transcript of 11/13/90 at 31, 32–33).

Balzano testified that the idea of taking a loan on Farina's house was around May 1988, after the death of his stepfather who, as indicated above, was also Farina's uncle. According to Balzano, he did not ask; it was Farina who offered to help him from the monies obtained through a refinancing of her house. (Transcript of 11/13/90 at 132). Balzano testified that he did not immediately accept the offer.

No, I told her that I needed time to think about it. She said that she would do it because if it was reversed I would do the same for her. Anybody in my family would have done the same thing. We were cousins through a stepfather and she was willing to help me out and I said to her, if I took this money that there is no promise for marriage or anything and there was nothing about a marriage or anything involved. I wanted to make sure that was secured [sic] and she said no. (Transcript of 11/13/90 at 92).

9. They got in touch with a finance company, but were refused. Farina called the Greenpoint Savings Bank ("Greenpoint Savings"), holder of an existing $25,000 mortgage on her house. Her monthly mortgage payments to Greenpoint Savings was then $262.00. She procured the appropriate refinancing or loan applications and, with the assistance of Balzano, filled out the necessary papers. After discussions with Balzano, she sought and obtained approval of a $125,000 loan from Greenpoint

Savings on her house. Like virtually everything else in this record, there is confusion as to the closing date on the loan. The records of Greenpoint Savings, however, indicate that the closing was on October 21, 1988. Farina attended the closing alone with her attorney. After payment of $24,929.72 in satisfaction of the existing mortgage and payment of certain bank charges, Farina received net proceeds of $93,224.78 on the refinancing of her house. Her new monthly mortgage payments to Greenpoint Savings was $1440.00. Balzano agreed informally with Farina that he would pay the full $1440.00 a month, but that she would ultimately be responsible for the approximately $25,000 earlier mortgage. These understandings were never reduced to any written form. Similarly, any understandings between Farina and Balzano regarding use of the net proceeds of the refinancing were never reduced to any written form.

10. On October 25, 1988, Farina and Balzano went together to the Nassau Federal Savings and Loan Association ("Nassau Federal") and opened up a joint account. On that day, Farina placed into a joint account the net proceeds from the refinancing of her house, i.e., $93,244.78. She was informed by the branch manager of Nassau Federal that on opening a joint account, both parties have unrestricted access to the monies therein, upon presentation of the bank book to a teller. (Transcript of 11/21/90 at 9). Between October 26, 1988 and November 16, 1988, Balzano withdrew more than $93,000 from the joint account, leaving a balance of $124.78. Apart from a relatively small sum remitted to Farina, Balzano used the majority of the joint account monies to pay past due gambling debts and to gamble; the remainder was used to satisfy a portion of his IRS obligations. (Transcript of 11/13/90 at 135–138).

11. Not long after November 16, 1988, Farina went to Nassau Federal to cash two checks given to her by Balzano. The bank declined to cash the checks, informing her that the joint account contained insufficient funds. This was the first time, according to Farina, that she learned about the with- drawals. She "freaked out" (Transcript of 11/13/90 at 40) and, among other things, contacted Balzano immediately; he reiterated his earlier promise to take care of the payments to Greenpoint Savings. (Transcript of 11/13/90 at 71). As earlier stated, no note or other instrument was ever drafted reflecting this promise.

12. Balzano made the payments of $1440.00 per month to Greenpoint Savings for approximately a year and his mother made one mortgage payment (Transcript of 11/13/90 at 48–49). In or around December 1989, Balzano tried unsuccessfully to work out a deal with Farina to reduce his monthly payment to $1,000. Balzano and/or his mother made no further mortgage payments on behalf of Farina after December 1989 and Balzano filed his Chapter 7 petition, as indicated, in January 1990.

13. It was Farina's belief that her relationship with Balzano would ultimately be consummated in marriage. She felt that Balzano, freed from his crushing debt, with his $60,000 a year job, pension and other perquisites as a housing policeman, could provide her with needed financial security and companionship. According to Farina, they discussed the topic of marriage around May 1988 and thereafter a number of times (Transcript of 11/13/90 at 68–69). Clearly, she developed the notion or "impression" that they would marry. (Transcript of 11/13/90 at 76, 79). Balzano, however, is steadfast in his assertions that he never promised to marry or take care of Farina and that he only agreed to pay the Greenpoint Savings loan each month. (Transcript of 11/13/90 at 103, 109–110, 147). On the contrary, Balzano claims Farina "always pressured me with marriage." (Transcript of 11/13/90 at 103, 92).

14. Farina testified that after his depletion of the monies in the joint account, Balzano disclosed for the first time that he was a gambler. (Transcript of 11/13/90 at 72). Balzano does not claim that he unmasked the extent or scope of his gambling proclivities prior to his withdrawal of the monies from the joint account; he does, however, assert that he told Farina early on in their relationship, in February 1988,

that he had gambling debts, without going into specifics. (Transcript of 11/13/90 at 115–116, 120).

15. On its face Balzano had untrammeled access to the joint account monies without any restraints or conditions. Nonetheless, Balzano's use of the monies was limited, according to Farina's understanding, to payment of his Internal Revenue Service debt only. (Transcript of 11/13/90 at 35, 36, 55, 57). The remainder of the monies, in Farina's view, was to be used for medical bills, house repairs and to otherwise provide for her overall general security. Balzano's understanding regarding use of the joint account proceeds was quite different. In Balzano's view there existed a verbal agreement or arrangement with Farina, allowing Balzano to use the monies to pay the Internal Revenue Service, credit card debt and whatever is necessary to get "all [of Balzano's] bills out of the way." (Transcript of 11/13/90 at 129, 131).

## II. DISCUSSION

11 U.S.C. § 727(b) provides that, except as provided in 11 U.S.C. § 523(a), a discharge under § 727(a) discharges a debtor from all debts that arose before bankruptcy. Inherent in this seemingly innocuous provision is a root tension between two essentially disparate tenets of our nation's bankruptcy law. One aim is to facilitate the debtor's economic rehabilitation by affording him or her a "fresh start" in life. The other objective concerns the prevention of a dishonest debtor's attempt to use the law's protection to shield his or her wrongdoing. Actions challenging the dischargeability of particular debts under 11 U.S.C. § 523(a)(2), (4) and (6) test the implementation of these contrasting statutory goals in specific situations.

■ Generally, our bankruptcy laws favor the debtor who invokes its protection. The centrality of the fresh start policy undergirding the nation's bankruptcy laws has been repeatedly articulated by the Supreme Court, perhaps most eloquently by Mr. Justice Sutherland, when he stated that a primary purpose of bankruptcy is to provide "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). *See also, Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971); *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 114, 27 L.Ed.2d 124 (1970) (per curiam); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915). Exceptions to discharge should be strictly construed in favor of the debtor and against the creditor. *Boyle v. Abilene Lumber, Inc. (In re Boyle )*, 819 F.2d 583, 588 (5th Cir.1987); *Driggs v. Black (In re Black )*, 787 F.2d 503, 505 (10th Cir.1986); *Schweig v. Hunter (In re Hunter )*, 780 F.2d 1577, 1579 (11th Cir.1986); *Household Finance Corp. v. Danns (In re Danns )*, 558 F.2d 114, 116 (2d Cir.1977). *See Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). A narrow and strict construction of the exceptions to discharge is necessary to avoid frustrating the bankruptcy statute's basic policy of giving the honest debtor a new beginning. *Caspers v. Van Horne (In re Horne )*, 823 F.2d 1285, 1287 (8th Cir.1987) ("[E]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code."); *Cross v. Murphy & Robinson Inv. Company (In re Cross )*, 666 F.2d 873, 879–80 (5th Cir.1982); *Dawley v. Gould (In re Gould )*, 73 B.R. 225, 227 (Bankr.N.D.N.Y.1987); *Congress Financial Corp. v. Levitan (In re Levitan )*, 46 B.R. 380, 383 (Bankr.E.D. N.Y.1985). The burden of proving that a debt comes within one of the statutory exceptions to dischargeability is upon the party opposing discharge of the debt. *Benich v. Benich (In re Benich )*, 811 F.2d 943, 945 (5th Cir.1987); *In re Danns, supra*, 558 F.2d at 116. *Cf.*, Bankruptcy Rule 4005 (burden of proof to sustain objection to discharge is on plaintiff). The Supreme Court recently held that the standard of proof for 11 U.S.C. § 523(a) dis-

chargeability exceptions is the preponderance of the evidence standard. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

## A. The 11 U.S.C. § 523(a)(2)(A) Exception To Dischargeability

■ Plaintiff contends that Defendant defrauded her of the equity in her home and that accordingly Defendant's debt to her must be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). This provision provides that a bankruptcy discharge does not relieve the debtor from any debt for obtaining money by "false pretenses, a false representation, or actual fraud". This provision and its predecessors under prior bankruptcy statutes have been consistently held to require proof that a debtor be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong; implied fraud, or fraud in law without the imputation of bad faith or immorality is just not enough. *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586, 5 Otto 704 (1877); *In re Hunter, supra,* 780 F.2d at 1579; *Gabellini v. Rega,* 724 F.2d 579, 580–581 (7th Cir.1984); *Public Fin. Corp. v. Taylor (In re Taylor),* 514 F.2d 1370, 1373 (9th Cir.1975); *Kovitz v. Testmetges (In re Testmetges),* 74 B.R. 911, 915 (Bankr.E.D.N.Y.1987), *aff'd* 86 B.R. 21 (E.D.N.Y.1988); *Bishop v. Greenblatt (In re Greenblatt),* 8 B.R. 994, 997 (Bankr.E. D.N.Y.1981). Specifically, to prevail on a claim that a debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), a creditor must prove each of the following elements:

1) The debtor made the representation;

2) That at the time the representation was made the debtor knew the representation was false;

3) The debtor made the representation with the intention and purpose of deceiving the creditor;

4) The creditor reasonably relied on the representation and the reliance was reasonably founded; and

5) The creditor sustained a loss or damage as the proximate consequence of the representation having been made.

*In re Hunter, supra,* 780 F.2d at 1579; *In re Testmetges, supra,* 74 B.R. at 914, *aff'd,* 86 B.R. at 24; *Minority Equity Capital Corp. v. Weinstein (In re Weinstein),* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983).

Plaintiff asserts that she was misled or deceived by Defendant into the refinancing of her home and, in turn, loaning him the proceeds of the refinancing. Contrary to Plaintiff's belief, she falls far short of proving that Defendant fraudulently induced her to thinking they would marry. Defendant denies having made any promises or agreements to marry or take care of Plaintiff. More importantly, the evidence viewed from an overall perspective indicates that the relationship was mutually encouraged and nurtured. Plaintiff was an active and willing participant in the deepening of the relationship. She loved him and was unwilling to come to terms with the sheer thought of losing him. Indeed, when confronted with that possibility in or around July 1988, Plaintiff admittedly became frantic and was desirous of helping Defendant to the extent necessary to preserve the relationship. On this record, that Plaintiff developed a fancy or impression that her relationship with Defendant would ultimately be consummated in marriage, may well have been the product of a wishful perception of reality and not any false representations, false pretenses or actual fraud of Defendant.

Plaintiff contends that Defendant intentionally concealed the fact he was a gambler, and that had she known of his gambling problem, she would not have refinanced her home and loaned him money. It is true that debtor's silence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A). However, Plaintiff's professed complete unawareness of Defendant's gambling is highly dubious. Although Defendant did not bare in full the nature and extent of his gambling proclivities, Plaintiff was made aware by Defendant early in their relationship that he had gambling debts. She ignored these red flags or warning signals. Having failed to probe further upon learning of the existence of gambling debts, Plaintiff's reliance upon Defendant's si-

lence, as to the scope of his gambling problem, was not reasonable. Under these circumstances, the observation of a bankruptcy court, cited approvingly by the Eleventh Circuit, is most apt.

> Bankruptcy law does not mandate that a debtor voluntarily disclose, without solicitation by a creditor, his personal habits, tendencies, welfare and life style, such as marital and family related problems, alcoholism, compulsive gambling and current state of physical and mental health, all of which may affect, directly and indirectly, the debtor's ability to satisfy his debts and obligations to disclose such matters to [the creditor], unless [the creditor] requested information of this nature.

*In re Hunter, supra,* 780 F.2d at 1580.

Plaintiff further claims that there was an understanding relating to usage of the monies in the joint bank account. She asserts that Defendant's usage of the monies was limited to payment of his Internal Revenue Service debt only. Plaintiff has offered no objective proof in support of her alleged understanding. The nature, extent and purpose of the relationship between Plaintiff and Defendant, as reflected in the record, tends to negate the existence of such restriction. Moreover, on its face, Plaintiff granted Defendant unfettered and untrammeled access to the joint account.

 Plaintiff loaned monies to Defendant in October 1988 when she refinanced her home and opened up a joint account with Defendant. At that time or earlier, Defendant orally agreed to pay back the loan. A bare promise to be fulfilled in the future, which is not carried out, does not render a consequent debt nondischargeable under § 523(a)(2)(A). *Schwalbe v. Gans (In re Gans),* 75 B.R. 474, 486 (Bankr.S.D. N.Y.1987). An unfulfilled promise to perform in the future is actionable only in contract. It is insufficient under § 523(a)(2)(A) simply to show that debtor left unfulfilled a prior oral representation or promise. Were this showing sufficient, virtually every oral obligation would give rise to a nondischargeable debt under § 523(a)(2)(A). A fraudulent promise under § 523(a)(2)(A) requires proof that at the time the debtor made it, he or she did not intend to perform as required. *Seepes v. Schwartz (In re Schwartz),* 45 B.R. 354, 357 (Bankr.S.D.N.Y.1985). In other words, Plaintiff herein must establish that Defendant had no intention of repaying when he obtained the loan and she has failed to do so. We recognize that fraudulent intent, intent to deceive or scienter can be inferred, since direct proof of state of mind is rarely available. Plaintiff, however, errs in assuming fraudulent intent can be presumed. Fraudulent intent may be inferred; it cannot be presumed. Such inference is negated where, as here, the Defendant made payments for approximately a year, and filed his Chapter 7 petition only after he reached the point where he could no longer do so and was unsuccessful in negotiations with Plaintiff to reduce the payments. Where a debtor makes payments to the lender, courts will consider this evidence as indicative of a debtor's lack of fraudulent intent. *In re Gans, supra,* 75 B.R. at 487; *In re Schwartz, supra,* 45 B.R. at 357; *Trumbull Building Center, Inc. v. Buttendorf (In re Buttendorf),* 11 B.R. 558, 561 (Bankr.D.Vt.1981) ("His promise to make payment to the Plaintiff appeared to be in good faith but, like all debtors who find themselves in financial straits, hope sprung eternal and he was looking at the light at the end of the tunnel which was not visible. He was thwarted in his efforts by continuing reverses.").

Based on the foregoing, this Court is satisfied that Plaintiff failed to establish with the requisite degree of proof the false representation, reasonable reliance and intent to deceive elements of her § 523(a)(2)(A) claim of nondischargeability. Having so determined, we now turn to Plaintiff's contention that the subject debt is nondischargeable under § 523(a)(4).

## B. *The 11 U.S.C. § 523(a)(4) Exception To Dischargeability*

 Section 523(a)(4) provides that a discharge under § 727 does not discharge a debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity,

embezzlement or larceny". This provision sweeps within its penumbra two distinct types of debtors—fiduciaries and nonfiduciaries. The phrase "while acting in a fiduciary capacity" does not qualify the categories of "embezzlement" or "larceny". Accordingly, the exception to dischargeability granted debts arising out of fraud or defalcation must involve fiduciaries; while the exception arising out of embezzlement or larceny may involve nonfiduciaries. *Moonan v. Bevilacqua (In re Bevilacqua )*, 53 B.R. 331, 334 (Bankr.S.D.N.Y.1985); *Moreno v. Schwartz (In re Schwartz )*, 36 B.R. 355, 358 (Bankr.E.D.N.Y.1983); *Great American Ins. Co. v. Graziano (In re Graziano )*, 35 B.R. 589, 593–94 (Bankr.E.D.N.Y.1983).

Section 523(a)(4) does not define the term "acting in a fiduciary capacity". In order to succeed in proving an exception to dischargeability based upon a debtor's fraud or defalcation while acting in a fiduciary capacity, the creditor must, as a threshold matter, demonstrate that the debtor was acting in a fiduciary capacity as that term has been construed by our federal courts. *In re Levitan, supra,* 46 B.R. at 384. The broad general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. *Parrotta v. Rausch (In re Rausch )*, 49 B.R. 562, 564 (Bankr.D.N.J.1985); *Teamsters Local 533 v. Schultz (In re Schultz )*, 46 B.R. 880, 884 (Bankr.D.Nev.1985). It is well established that the term "fiduciary" in the dischargeability context applies only to express or technical trusts and does not extend to implied trusts, which are imposed by operation of law as a matter of equity. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Upshur v. Briscoe,* 138 U.S. 365, 375–76, 11 S.Ct. 313, 316–17, 34 L.Ed. 931 (1891); *Chapman v. Forsyth,* 43 U.S. (How.) 202, 207, 11 L.Ed. 236 (1844); *Teichman v. Teichman (In re Teichman )*, 774 F.2d 1395, 1398 (9th Cir.1985); *Barclays American/Business Credit, Inc. v. Long (In re Long )*, 774 F.2d 875, 878 (8th Cir.1985); *Bamco 18 v. Reeves (In re Reeves )*, 124 B.R. 5, 7 (Bankr.D.N.H.1990); *In re Levi-*

*tan, supra,* 46 B.R. at 384; *Air Traffic Conference of America v. Hofherr (In re Paley )*, 8 B.R. 466, 469 (Bankr.E.D.N.Y. 1981). Moreover, the requisite trust relationship must exist prior to the act creating the debt and without reference to it. *See, e.g., Davis, supra,* 293 U.S. at 333–334, 55 S.Ct. at 153–54, 79 L.Ed. 393.

Plaintiff has failed to sustain the threshold burden that the requisite fiduciary relationship existed between her and Defendant. She repeatedly employs the fiduciary concept in the popular sense of the term, arguing that she reposed trust or confidence in the Defendant. Not surprisingly, she cites no authority for the simplistic supposition that her familial, personal and/or romantic relationship with Defendant, without much more, transformed Defendant into a fiduciary within the circumscribed ambit of § 523(a)(4).

Unlike debts arising out of fraud or defalcation, those arising out of larceny or embezzlement need not involve a fiduciary. Thus, for a creditor to sustain a § 523(a)(4) exception to dischargeability predicated on larceny or embezzlement there is no requirement of showing, as an element of proof, that a fiduciary relationship exists. Plaintiff here charges Defendant with larceny or embezzlement.

Larceny is defined "as the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner." *In re Graziano, supra,* 35 B.R. at 594. *See Also, First Nat'l Bank of Midlothian v. Harrel (In re Harrel )*, 94 B.R. 86, 90 (Bankr.W.D.Tex.1988). In the instant case, the initial element of larceny, that the original taking of property be unlawful, is not present. Plaintiff opened up a joint bank account, placed the proceeds of the refinancing into that account and gave Defendant the bank book. Clearly, Defendant came into possession of the funds lawfully.

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or to whose hands it has lawful-

ly come". *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895); *I.B.E.W. Local Union No. 602 v. Bryant (In re Bryant),* 73 B.R. 956, 959 (Bankr.N.D.Tex.1987). It differs from larceny in that the original taking of the property was lawful. To prove embezzlement, the creditor must demonstrate both that the debtor appropriated funds for his own benefit, and did so with fraudulent intent. *United American Ins. Co. v. Koelfgen (In re Koelfgen),* 87 B.R. 993, 997 (Bankr.D. Minn.1988); *In re Graziano, supra,* 35 B.R. at 595; *American Family Ins. Group v. Gumieny (In re Gumieny),* 8 B.R. 602, 605 (Bankr.E.D.Wis.1981). Absent intent to defraud, a debtor's appropriation of funds does not rise to the level of embezzlement. *In re Bevilacqua, supra,* 53 B.R. at 334; *Commonwealth of Virginia Commission of Game and Inland Fisheries v. Meyers (In re Meyers),* 52 B.R. 901, 905 (Bankr.E.D.Va.1985); *Wilson v. Mettetal (In re Mettetal),* 41 B.R. 80, 88 (Bankr.D. Tenn.1984). *See also, Farmers & Merchants Bank of Eatonton v. Alexander,* 70 B.R. 419, 423 (M.D.Ga.1987) ("An essential element of ... embezzlement is a showing of intent to harm the true owner of the property"). In the instant case, Plaintiff fails to articulate, much less prove, a coherent or principled basis upon which a court can base a finding of fraudulent intent by the Defendant. On the contrary, it would seem that to the extent funds were withdrawn from the joint bank account by Defendant to pay his past due debts, fraudulent intent is negated by the evidence tending to indicate that he had reasonable grounds to believe he had a right to so use the money. Moreover, to the extent Defendant withdrew monies to satisfy his gambling cravings, fraudulent intent is negated by, among other things, his payments for approximately a year, inclusive of Plaintiff's original mortgage, and his efforts to negotiate a deal with Plaintiff.

Based on the foregoing, this Court believes that Plaintiff has utterly missed the point in her efforts to demonstrate that a fiduciary relationship existed between her and Defendant, and also failed to meet the burden of proving larceny or embezzlement within the meaning of § 523(a)(4).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction in this lawsuit pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a); this lawsuit is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2. The Plaintiff has failed to sustain her burden of proving the elements essential to establish the nondischargeability of her claim under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4).

3. The Debtor–Defendant's obligation to the Plaintiff is dischargeable pursuant to the discharge granted by 11 U.S.C. § 727(a).

4. The Debtor is entitled to an order dismissing the complaint.

5. The parties shall bear the respective costs in this lawsuit.

AN APPROPRIATE ORDER SHALL BE ENTERED IN CONFORMITY HEREWITH.