In re Renee **DEMPSTER**, Debtor.

Richard P. **SCHAFFER**, Plaintiff,

v.

Renee **DEMPSTER**, Defendant.

Bankruptcy No. 94 B 07012.
Adv. No. 94 A 00925.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 5, 1995.

Steven D. Blanc, Tully & Weinstein, Chicago, IL, for plaintiff.

Steven G. McCulley, Schaumburg, IL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Following trial of this Adversary Complaint, both sides having rested, based on consideration of evidence admitted and arguments of the parties, the Court now makes and enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### Introduction

This Adversary proceeding relates to the bankruptcy case filed by the defendant, Ms. Renee Dempster ("Defendant," "Dempster," or "Debtor"), under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* The plaintiff, Richard P. Schaffer ("Plaintiff" or "Schaffer"), seeks to bar dischargeability of a judgment debt due to him from her.

These parties were close friends for roughly ten years, from 1983 to 1993. They cohabitated from 1991 to 1993. At Schaffer's request and with his full knowledge, Dempster managed every detail of his financial affairs from 1986 to 1993. Although not married, they maintained various joint accounts and charge cards and owned some assets together. Schaffer totally relied on Dempster to take care of his finances because she was experienced in financial matters and he did not wish to handle his own affairs. After they separated, however, he claimed that she had used their relationship to defraud him. He sued her in state court.

Schaffer alleged in the suit that Dempster fraudulently converted his retirement account and thereby cost him additional income taxes, and that she fraudulently used his credit through use of their joint Optima credit card. Plaintiff claimed the following damages:

| | |
|---|---:|
| Retirement Account | $21,635.31 |
| IRS Penalty | 2,403.92 |
| IRS Federal Income Tax | 7,212.00 |
| Illinois Income Tax | 721.00 |
| Lost Interest on Retirement Account | 3,004.90 |
| Optima Card | 4,240.48 |
| Interest on Optima Card | 774.00 |
| | |
| Total Compensatory Damages Claimed | $39,990.71 |

By default, the state court awarded Schaffer judgment for $40,000.00 in compensatory damages plus $40,000.00 in punitive damages. He now claims that Debtor obtained the money and credit described above under false pretenses by making false representations and by willful and malicious conduct, and therefore the judgment debt should be exempt from discharge pursuant to 11 U.S.C. § 523(a)(2), (4), and (6). By reason of the following Findings and Conclusions, judgment will enter for the Debtor–Defendant.

### Relationship of the Parties

Schaffer was employed at the Harry Alter Company ("Harry Alter") from 1964 through 1987.

Beginning in 1983, Schaffer and his employer made contributions to his retirement account. The account was in his name and under his Social Security account number [redacted]. By the time he left employment at Harry Alter, Schaffer's retirement account had an approximate value of $20,000.00.

Prior to 1984, Schaffer lived with his then wife at their marital residence in Northbrook, Illinois. In 1984, they divorced. Pursuant to the divorce decree, the Northbrook residence was sold. Plaintiff's share of net proceeds from the sale amounted to roughly $22,000.00. He deposited those proceeds into his Harry Alter retirement account, raising the total value of that account to roughly $42,000.00.

Schaffer met Defendant Renee Dempster at a Harry Alter function in late 1983, just before his divorce. She represented to him that her mother was involved with a large construction company in New York and was very wealthy. She also said that her father was living in California and had been involved with the invention of the Dempster–Dumpster and was likewise very wealthy.

Schaffer and Dempster began dating soon after, in late 1983.

Dempster was employed as a financial officer and comptroller. Schaffer soon entrusted her to prepare his annual income tax return and to assist him in financial investing and in connection with all his other financial matters and accounts.

In 1987, Schaffer left Harry Alter and began working for a company known as Sid Harvey.

At Schaffer's request, Dempster transferred all funds in his Harry Alter account into a new retirement account in his name at Sid Harvey.

After the sale of his marital residence in Northbrook, Schaffer lived in a rented apartment in Northbrook for several years. In 1987, Dempster recommended that he pur-

chase a condominium in Schaumburg, Illinois. Acting on that advice, Schaffer purchased such a condominium on Deerpath Road in Schaumburg, Illinois. Schaffer attended the closing and paid down approximately $20,000.00. Title to the condominium was held in his name alone.

Schaffer knew that the $20,000.00 down payment came from the Harry Alter retirement account before it was shifted to the new Sid Harvey retirement account. He claimed that there remained in that retirement account approximately $22,000.00 plus interest after the condo purchase, which should have gone entirely into the Sid Harvey retirement account. However, as to the $42,000.00 in retirement funds originally in his Harry Alter account in 1987, those proceeds were actually distributed approximately as follows: $20,000.00 towards the Schaumburg condominium; $10,000.00 to a 401K plan at Sid Harvey; $5,000.00 to a relative of Schaffer's; and $2,000.00 towards the purchase of a boat, for a total of $37,000.00. Dempster claims that she paid down $7,000.00 of her own funds as earnest money on the Schaumburg condominium, but $5,000.00 of that apparently came from the Harry Alter account. The remaining $2,000.00 she paid down was apparently a gift by her to Schaffer since the condominium was titled only in his name.

In 1991, Dempster sold her house in Broadview, Illinois, and asked Schaffer if she could stay with him at the Schaumburg condominium until she could locate a new residence. He agreed.

Schaffer and Dempster then cohabitated from 1991 through their breakup in March of 1993.

Schaffer and Dempster opened a joint checking account at Citibank in Schaumburg [redacted] in 1991.

After Dempster moved into the Schaumburg condominium, all of his, her, and their household expenses were paid out of that joint checking account, almost all of them through checks drawn by her on that account since she was asked by him to manage the checking account and pay all their expenses through it. During the period of their cohabitation, Schaffer's take-home pay from Sid Harvey amounted to approximately $1,057.00 paid twice a month, and those amounts were all automatically deposited into the joint Citibank account. During that period, Dempster's take-home pay at her job was also always deposited into the joint Citibank account. Her monthly take-home income during their cohabitation was roughly equal to Schaffer's.

Their mortgage payment on the Schaumburg condo (made out of their joint checking account) amounted to $700.00 a month until that mortgage was refinanced in early 1992. After refinancing, the mortgage payment amounted to approximately $970.00 a month. Utilities amounted to about $50.00 a month and telephone another $30.00 a month.

Schaffer usually received large annual refunds (approximately $5,500.00 to $6,000.00) from the IRS after filing his annual income tax returns prepared for him by Dempster. The reason for those large refunds was that Schaffer, acting on Dempster's advice, intentionally overwithheld tax deductions from his pay so as to create a form of savings account with the Internal Revenue Service.

During the course of their relationship, Dempster purchased the following items for Schaffer as gifts:

A. In June of 1985, a Celebrity Inboard/Outboard boat that cost approximately $13,000.00 (of which he paid $2,000.00 out of his retirement account monies, as noted earlier);

B. In or around July of 1986, a 1957 Thunderbird automobile that cost approximately $20,000.00, a car viewed in some circles as a treasured antique;

C. A surprise 40th birthday party held aboard a ship docked in Lake Michigan. The party was elaborate and very expensive; and

D. A set of golf clubs that cost approximately $565.00.

The Thunderbird and boat were each titled in Schaffer's name, and there was no doubt they were gifts from Dempster to him. He still possesses and owns the boat, car, and golf clubs.

None of those gifts were within the means of either Plaintiff or Defendant based on

their respective employment income. However, because she had represented herself as having substantial means, or because she had sold her own house, Dempster appears to have had sources other than monthly income to purchase those gifts.

### *The IRA Account and Refinancing of the Mortgage*

Dempster took steps necessary to open an Individual Retirement Account in Schaffer's name. With his consent, she signed his name to open that account and named his sister as death beneficiary. However, Dempster provided all funding to this account. By the time that account was ultimately redeemed, her deposits therein amounted to nearly half of its value with the balance coming as the result of reinvestment of earnings on the account. Schaffer did not introduce documentary evidence establishing that he had paid any of his own monies into that account.

Schaffer was aware of the IRA account. In fact, as a condition of his divorce of 1984, he signed a Promissory Note to Dempster acknowledging that the payments she made to start the account were a loan from her to him. As a result, the account was considered in his divorce proceeding to be non-marital property for purposes of that divorce.

The custodian of that IRA retirement account was IDS Financial Services, Inc. [redacted].

This IRA account was originally opened with $1,000.00 cash coming from Dempster's money, but using Schaffer's purported signature. Dempster signed Schaffer's name to open that account. He gave her authority to manage his finances, knew the account was opened, consented to it, and thereby tacitly approved her signing his name because he did not sign anything to open the account and knew she must have done so.

Schaffer and Dempster lived well and expensively. They began discussing their resulting financial problems in early 1991. To meet those problems, they obtained a refinanced mortgage through Citicorp to reduce their debts. A portion of the proceeds of refinancing were spent on both Schaffer's debts and Dempster's debts, mainly credit card debt that was otherwise unmanageable by them.

The parties further discussed their financial concerns and chose to close the IRA account in order to pay their other outstanding obligations. The IRA account was redeemed by Dempster with Schaffer's knowledge and implied consent to her signing his name to redeem that account (because he knew it was redeemed, he did not sign anything to effectuate redemption, and he raised no objection at the time), and the IRA funds were placed into their joint checking account.

Those funds from the IRA account were subsequently paid out through checks drawn on their joint account payable for their various household expenses as well as the individual needs of both.

In early 1992, acting on Dempster's advice, Schaffer refinanced the Schaumburg condominium for two purposes. First, he needed additional funds to pay off his personal credit card debts. Secondly, Dempster suggested, and he agreed to, the retitling of the Schaumburg condominium in joint tenancy with her.

Schaffer's large credit card balances were paid off through the proceeds of refinancing.

After refinancing the condominium, he stopped purchasing any goods or services with his credit cards. His purchases after that were made solely with cash.

As of June 22, 1992, the above-referenced retirement account at IDS Financial had a fair market value of $24,039.23, most, if not all, of which had been deposited by Dempster from her own funds, plus earnings on the account.

In or around June of 1992, Dempster, without discussion with Schaffer, requested from IDS Financial a change of address form (Form 50) for purposes of changing his address of record with IDS Financial.

Schaffer normally received his mail at his residence in Schaumburg, Illinois.

At the time of the address change, Dempster was employed at Port To Port, using a work address of 1201–25 West Morse Avenue.

Dempster, without discussion with Schaffer, wrote his signature on IDS Form 50, changing his address of record from 234 Deerpath, Schaumburg, Illinois 60193, to Port To Port, 1201–25 West Morse Avenue, Elk Grove Village, Illinois.

In June of 1992, Dempster, without discussion with Schaffer, requested from IDS Financial a Redemption Form (Form F110–E) for purposes of withdrawing his retirement account that she had built up through her deposits.

On or about June 22, 1992, Dempster signed Schaffer's name on IDS Form F110–E, whereby she acted to redeem all of the shares of his retirement account at IDS Financial (Account No. 0103–654–3221–9).

On June 26, 1992, the IDS Mutual Fund Group issued a check payable to Schaffer in the amount of $21,634.31. That check was sent to his newly reported address of 1201–25 West Morse Avenue. IDS withheld the remaining $2,403.92 to pay the required IRS penalty for early withdrawal of a retirement account.

On or about June 29, 1992, Dempster, without discussion with Schaffer, signed his endorsement on IDS Financial check number 3186481.

On or about June 29, 1992, without discussion with Schaffer, Dempster deposited $21,200.00 into their joint Citibank checking account. The remaining $435.31 was spent on expenses of their common household.

Through the foregoing steps, Dempster continued to manage every aspect of Schaffer's financial matters, as he knew she was doing and as he wanted her to do. She thereby transferred proceeds of an account in his name that had been created by her money into their joint checking account, which she continued to manage and spend for their joint needs. Both parties thereafter received joint benefit of the $21,200.00 that was deposited into the joint Citibank checking account, which she used in large part for their common household expenses and individual needs of each.

Although Schaffer had access to the joint Citibank checking account, he entrusted Dempster to review the monthly bank statements and write almost all the checks on that account.

### The Plaintiff's 1992 Tax Return

Schaffer did not lift a finger to review the monthly bank statements and credit card bills, and even allowed Dempster to prepare and file his individual tax return. Their relationship had gone so far that she even signed his name for him on one or more of his tax returns. He tacitly authorized Dempster to sign his income tax returns as part of her total management of his financial matters because he knew that returns had been filed without his having signed.

In or around March of 1993, Dempster handed Schaffer a check in the approximate amount of $500.00 as his 1992 IRS tax refund. He was surprised and angered by the amount as he had not read or signed his 1992 tax return, and the refund amount was much smaller than his customary annual tax refund. However, that refund was lower than usual because the IRA redemption was reported on his 1992 tax return and a penalty for early withdrawal from the IRA account was therefore imposed.

Dempster has not furnished Schaffer with a copy of his own 1992 federal income tax return, but it was not proved either that she retained a copy or that he asked the IRS for a copy.

### The Optima Card and Sale of the Schaumburg Condo

In June of 1991, Schaffer obtained a credit account with the American Express Centurion Bank known as the Optima Card (Account no. 3737–524405–11009).

In late 1991, Dempster, without Schaffer's express authority but with his knowledge, obtained an additional charge card from Optima on that account.

During the period of January 1992 through December 1992, Dempster, with Schaffer's knowledge, made charges on the Optima Card account in the amount of $4,240.48, largely for their common household expenses.

In April 1993, Schaffer and Dempster sold their Schaumburg condominium. Each received approximately $5,000.00 a piece after payment of all encumbrances and expenses.

Schaffer broke off the relationship in early 1993. After the sale of the Schaumburg condominium, he moved to Wisconsin and began working for Illinois Supply Company in Waukegan, Illinois.

### Overview of Their Relationship

Schaffer had emphasized a problem in trusting women. As a result thereof, and to induce his trust in her, Dempster acquiesced to the placement of certain assets in Schaffer's name alone. This included the purchase of a boat on which she paid about $11,000.00 of the amount due, and the purchase of a Thunderbird for $20,000.00 for which she took out a loan to pay part or all of that amount. Both that boat and the car were gifts from her to him, although he contributed an additional $2,000.00 (out of his retirement funds) to purchase the boat.

Dempster managed Schaffer's financial affairs from 1986 until their breakup in 1993. During this time period, they would sometimes discuss their financial matters. At no time did Schaffer express displeasure with Dempster's performance until after their relationship was terminated.

At no time did Dempster deny Schaffer access to his records or deny him presentation of same except for the 1992 tax return, which was not accessible to her because she did not retain a copy.

The change of address brought about in 1992 was a result of problems with delivery of mail, for Dempster's convenience in managing Schaffer's affairs, and because Schaffer exhibited no interest in reviewing financial documents.

Over the life of their joint checking account, Dempster claims that she caused to be deposited therein from her salary monies in excess of $62,000.00, plus the $21,200.00 IRA proceeds that had originated from her deposits.

As a result of their discussions, Schaffer adjusted upward his federal income tax withholding from his salary so that adequate funds would be available to pay the impending tax ramifications as a result of redeeming the IRA. Adequate funds were thereby made available to pay the resulting tax obligation, and Schaffer even received a small refund from the Internal Revenue Service despite the IRA redemption.

As earlier noted, Dempster's name was placed on the Optima Card account jointly with Schaffer's. Schaffer was aware of her having the card, witnessed her use of same on numerous occasions, and never objected to it. His testimony to the contrary was not consistent with their admitted personal relationship and his entrustment in her of total responsibility for his financial matters. His claim of ignorance that she came on the account jointly with him is not credible. He was fully aware that Dempster's name had been placed on that line of credit, that she had access to it, and that she used it.

The relationship broke off in early 1993 and Schaffer moved out. He then was no longer employed by Sid Harvey. Thus, there was no longer an automatic deposit of his paycheck into the joint account. Dempster maintained the residence and paid all household bills until the residence was sold in April 1993. Ultimately, she filed for bankruptcy relief.

### State of the Evidence

Much of the findings here as to cash flow and expenditures through the checking account is based on testimony of parties. Neither party brought in bank records or canceled checks to verify their respective testimony. While she did indeed manage their joint affairs and their records involving those matters, he did not subpoena bank or charge account records for trial either from her or from the bank. Since the burden of proof lay with him and his testimony of ignorance about expenditures was not credible in light of his consent to her complete fiscal management responsibilities over his affairs, the lack of such definitive records was a serious blow to his case.

In a classic "he said, she said" case, the lack of definitive records harms the party

with the burden of proof. That burden was Schaffer's.

Schaffer did not establish by a preponderance of the evidence that Dempster committed fraud or defalcation while acting in a fiduciary capacity or that she embezzled or stole his funds. Nor did he establish by a preponderance of the evidence that she obtained money, property, or use of his credit card by false pretenses, false representations, or fraud.

Fact statements set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal conclusions contained in the Findings of Fact will stand as additional Conclusions of Law.

### CONCLUSIONS OF LAW

#### *Jurisdiction*

This matter is properly before this Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the Northern District of Illinois. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

#### *Limited Issue Preclusive Effect of Earlier State Court Default Judgment*

■ Bankruptcy judges ordinarily must make independent determinations as to whether particular debts should be excepted from discharge under § 523(a). *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir.1994). However, the doctrine of collateral estoppel fully applies to bankruptcy discharge exception proceedings. *Id.* at 1378–79 (*citing Klingman v. Levinson*, 831 F.2d 1292, 1294–95 (7th Cir.1987); *Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991) ("[C]ollateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).")). Thus, where a court of competent jurisdiction has previously ruled against a debtor upon specific issues of fact that independently comprise elements of a creditor's nondischargeability claim, the debtor may not seek to relitigate those underlying facts in bankruptcy court.

■ There is collateral estoppel from reconsidering a previously-litigated issue only if: (1) the issue sought to be precluded is the same as that resolved in the prior litigation; (2) the issue was "actually litigated" in the earlier action; (3) determination of the issue was essential to final judgment in the earlier proceeding; and (4) the party against whom estoppel is invoked was fully represented in the prior action. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir.1990). As a matter of well-settled law, default judgments are not ordinarily given preclusive effect in subsequent court proceedings because no issue was "actually litigated" in the earlier proceeding. *See Meyer*, 36 F.3d at 1379; *Matter of Cassidy*, 892 F.2d 637, 640 n. 1 (7th Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). That is the case here. Thus, an independent determination must be made here as to whether these debts should be excepted from discharge under § 523(a)(2)(A), (4), and (6). *See Meyer*, 36 F.3d at 1378–79.

■ The amount of debt due Plaintiff was determined by the state court judgment that is *res judicata* on that issue. Accordingly, the amount of debt due to Plaintiff was established by the default judgment against Defendant. However, whether the judgment is non-dischargeable under federal standards must be determined from the evidence presented here.

#### *Dischargeability Standards of Proof*

■ The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. at 659–60. To further the policy of providing the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer*, 36 F.3d at 1385; *Matter of Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985).

Thus, Schaffer had to prove by a preponderance of the evidence that Debtor's judgment debt to him is exempt from discharge under § 523(a)(2)(A), § 523(a)(4), and/or § 523(a)(6).

### Nondischargeability of Debts Arising from Fraudulent Conduct: § 523(a)(2)(A)

■ Section 523(a)(2)(A) of the Bankruptcy Code directs that a debtor should not be discharged from any debt obtained by false pretenses, a false representation, or actual fraud (other than statements respecting the debtor's or an insider's financial condition, which are governed by § 523(a)(2)(B)).[1] To succeed on his claim that his judgment debt is non-dischargeable under § 523(a)(2)(A), Schaffer must prove the following four elements: (1) Dempster obtained the funds and credit at issue from Schaffer through representations she either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentations; (2) Dempster possessed the requisite scienter, i.e. she actually intended to deceive Schaffer; and (3) Schaffer actually relied on the misrepresentations, to his detriment.[2] *Mayer v. Spanel Int'l Ltd. (Matter of Mayer)*, 51 F.3d 670, 673 (7th Cir.1995); *Goldberg Secs., Inc. v. Scarlata (Matter of Scarlata)*, 979 F.2d 521, 525 (7th Cir.1992), *reh'g denied* (1993); *First Nat'l*

*Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423–24 (7th Cir.1985).

Plaintiff did not establish at trial any false express or implied representation that Debtor made to Schaffer to obtain the funds or credit at issue.

■ With respect to the closure of Schaffer's IRA account, Dempster did not dupe Schaffer into allowing her to access that account or to close it and deposit the proceeds into their joint Citibank checking account. Throughout most of their ten-year relationship, and upon Plaintiff's wish, Debtor handled all aspects of their joint and individual financial affairs. Pursuant to her accepted responsibilities, and with Schaffer's knowledge and consent, she opened the IRA account in his name. She further provided all funding to the account. Schaffer did not establish that he contributed his own funds to that account.

In 1991, as a result of their dire financial straits, Schaffer and Dempster agreed to close the IRA account and pay other outstanding obligations. At that time, Dempster's deposits totalled roughly one-half of the account's value, with the balance coming as a result of reinvestment of earnings on the account. As part of her total management of their financial affairs, Dempster signed Schaffer's endorsement to close the account. She closed that account after discussion with

---

1. Section 523(a)(2)(A) of the Bankruptcy Code provides:

   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

   .    .    .    .    .

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

   .    .    .    .    .

   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

   11 U.S.C. § 523(a)(2)(A) (1995).

2. "Reliance" does not, as this and some other courts have previously held, generally require proof that the creditor conducted an investigation reasonably designed to discover whether the would-be borrower is telling the truth. *See, e.g., In re Iaquinta*, 98 B.R. 919, 923 (Bankr.N.D.Ill. 1989) (Squires, J.) (Creditor's failure to investi-

gate whether debtor had proper title to automobiles in which it obtained security interest was unreasonable, precluding finding of nondischargeability); *In re Smigel*, 90 B.R. 935 (Bankr. N.D.Ill.1988) (Coar, J.) (Bank's failure to verify debtor's financial statements was unreasonable; thus, debt was dischargeable under § 523(a)(2)(B)); *In re Mitchell*, 70 B.R. 524, 527 (Bankr.N.D.Ill.1987) (Schmetterer, J.) (Landlord's failure to verify tenant/debtor's false statements of credit-worthiness was unreasonable; debt was thus dischargeable under § 523(a)(2)(B)). Rather, upon recent Seventh Circuit authority, the creditor need only establish that its claim to reliance is not so unreasonable as to defeat a finding of reliance in fact. *Mayer*, 51 F.3d at 675–76 (accepting the test for reliance from *In re Kreps*, 700 F.2d 372, 375–76 (7th Cir.1983): "[a] victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be denied recovery under the securities laws—or be blocked by a discharge under the bankruptcy laws—just because he did not conduct a more thorough investigation.")

Schaffer and with his understanding that she would use those funds to satisfy other outstanding debts.

She did precisely just that. Dempster placed those funds in their joint Citibank checking account and proceeded to pay various joint and individual expenses out of those proceeds. As previously found, both parties received joint benefit of the $21,200.00 deposited into the joint checking account upon closure of Schaffer's IRA account. Thus, Debtor did not obtain access to those funds through false representation.

■■■ Moreover, with respect to her use of their joint Optima Card, Debtor also did not obtain access to Schaffer's credit through misrepresentation. As previously found, he was fully aware that she had signed on jointly to his Optima Card account. He knew she had the card, witnessed her use of it, and never voiced objection to her use of the card. Dempster ran the balance on that card up to $4,240.48 largely by paying common household expenses through which they derived joint benefit. Schaffer has not demonstrated that she obtained access to his credit by way of misrepresentation. Accordingly, Plaintiff has not carried his burden of demonstrating by a preponderance of the evidence that his default judgment is non-dischargeable under § 523(a)(2)(A).

## Nondischargeability of Debts Arising from Fraud or Defalcation in Fiduciary Capacity, Embezzlement, or Larceny: § 523(a)(4)

Section 523(a)(4) provides that debts incurred by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny are non-dischargeable.[3]

### Fraud or Defalcation While Acting in a Fiduciary Capacity

■■■ To establish fraud or defalcation under § 523(a)(4), the moving party must show:

(1) existence of an express trust or fiduciary relations of "inequality that justify the imposition on the fiduciary of a special duty, basically to treat his principal's affairs with all the solicitude that he would accord his own affairs," *Matter of Marchiando*, 13 F.3d 1111, 1116 (7th Cir.), *cert. denied sub nom. Illinois Dept. of Lottery v. Marchiando*, —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); (2) the debt was caused by the debtor's fraud or defalcation; and (3) the debtor acted as fiduciary to the plaintiff at the time the debt was created. *Klingman v. Levinson*, 831 F.2d at 1295; *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 388 (Bankr. N.D.Ill.1994) (Schmetterer, J.) (and cases cited).

■■■ When determining whether a particular debtor acted in a fiduciary capacity for § 523(a)(4), courts must first look to federal law. *See, e.g., Coronet Ins. Co. v. Blumberg (In re Blumberg)*, 112 B.R. 236, 240 (Bankr.N.D.Ill.1990) (Schmetterer, J.). The traditional non-bankruptcy definition of a "fiduciary" relationship—a relationship involving confidence, trust, and good faith—is "far too broad" and therefore not applicable in bankruptcy. *Illinois Dept. of Lottery v. Marchiando (In re Marchiando)*, 142 B.R. 246, 249 (N.D.Ill.1992), *aff'd*, 13 F.3d 1111 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). It is well established that the term "fiduciary" in the dischargeability context is limited to express or "technical" trusts or trusts created by statute, and does not extend to implied trusts imposed as a matter of equity. *Pawlinski*, 170 B.R. at 389 *see also Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 532 (Bankr. E.D.N.Y.1991) (*citing, inter alia, Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934)).

■■■ Plaintiff has not alleged, nor has this Court found, a statute under which

---

**3.** Section 523(a)(4) of the Bankruptcy Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4).

Dempster would be deemed a fiduciary for purposes of § 523(a)(4). Thus, it need only be determined whether the parties established an express or technical trust. An express trust is created when a settler manifests an intent to create such a trust and identifies the subject matter of the trust, the nature of the beneficiaries' interests, and the manner in which the trust is to be performed. *Pawlinski*, 170 B.R. at 389 (citations omitted). Express or technical trusts are formed by positive acts of both parties, typically manifested in writing by a deed, will, or other such agreement. *See* Robert E. Ginsberg & Robert D. Martin, *Bankruptcy: Text, Statutes, Rules* § 11.06[g] at 11–95.

Plaintiff has not demonstrated by a preponderance of the evidence that Defendant served as a fiduciary as that term has been narrowly defined by controlling case law. True, Plaintiff did informally entrust all of his financial affairs to Defendant. However, he apparently relies on the term "fiduciary" in its popular context, arguing that he entrusted her with complete management of his financial affairs. Plaintiff did not establish that their close relationship, without more, gave rise to an express or technical trust. *See Balzano*, 127 B.R. at 532. Plaintiff's entrustment did not manifest the degree of formality and intent necessary to establish a fiduciary relationship for purposes of § 523(a)(4).

### Embezzlement or Larceny

Even if Defendant acted outside a fiduciary capacity, Plaintiff's debt could still be deemed non-dischargeable if he could establish that the debt was incurred by embezzlement or larceny. Larceny under § 523(a)(4) necessitates a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir.1991); *Balzano*, 127 B.R. at 532. Because Plaintiff was found to have consented to Dempster's closure of the IRA account and use of the Optima Card, she did not commit larceny as defined for purposes of § 523(a)(4).

Embezzlement under § 523(a)(4) has been defined as the "fraudulent appropriation of property by a person to whom such property was entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir.1989) (*quoting Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)); *see also Ryan & Nelson, Ltd. v. Collins (In re Collins)*, 1995 WL 16774 (Bankr.N.D.Ill.) (Squires, J.) (*citing Scarlata*, 979 F.2d at 521). Embezzlement differs from larceny only in that the original taking was lawful. To prove embezzlement, Plaintiff must show that Debtor appropriated the funds for her own benefit. *Weber*, 892 F.2d at 538. Moreover, she must have done so with fraudulent intent. *Id.* Absent intent to defraud, the misappropriation of funds will not constitute embezzlement.

Clearly, Plaintiff entrusted Defendant with the proceeds of his retirement account, but she had contributed her own money to build up that account and did not misappropriate that amount for her personal use, but rather used it for their common needs through depositing the proceeds into their joint checking account. Moreover, she did not obtain those funds with fraudulent intent or by deceit. As previously found, she did so with Schaffer's general understanding and at least implied consent.

Similarly, Defendant did not embezzle Schaffer's credit on the joint Optima account. She used that credit for their joint benefit in paying household expenses, and did so openly, with Plaintiff's knowledge and consent.

Thus, Plaintiff failed to qualify his judgment debt as non-dischargeable under § 523(a)(4).

### Nondischargeability of Debt Incurred by Intentional Injury: § 523(a)(6)

Section 523(a)(6) provides that a debtor should not be discharged from any debt incurred by "willful and malicious injury."[4] "Willful" conduct under § 523(a)(6) is

4. Section 523(a)(6) of the Bankruptcy Code pro-    vides:

"deliberate or intentional" conduct. *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994) (citation omitted). "Malicious" as the term is used means in conscious disregard of one's duties or without just cause or excuse even in the absence of personal hatred, ill will, or specific intent to do harm. *Id.*

Plaintiff has presented no evidence to support his contention that his debt arose through willful and malicious injury. Dempster's conduct was plainly willful as she deliberately used the funds and credit at issue. However, her conduct did not even approach being malicious. She used those assets to satisfy joint needs or financial obligations in accordance with Plaintiff's request that she handle his financial affairs—not in conscious disregard of those duties. Thus, Plaintiff's debt is not non-dischargeable under § 523(a)(6).

### CONCLUSION

Accordingly, the Plaintiff's complaint is entirely without merit. By separate order, judgment is entered for Defendant.

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]